# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

LORRAINE DUFFY,                     :
                                    :
    Plaintiff,              :
                                    :
    v.                      :    C.A. No. 06-460-SLR
                                    :
DEPARTMENT OF STATE, an  :
Agency of the State of Delaware,  :
                                    :
    Defendant.              :

## <u>APPENDIX TO DEFENDANT'S OPENING BRIEF</u>

## <u>IN SUPPORT OF SUMMARY JUDGMENT</u>

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

Marc P. Niedzielski (#2616)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8324
Attorney for Defendant

## **TABLE OF CONTENTS**

Charge of Discrimination ................................................................................A000001

Answers to First Set of Interrogatories Directed to Plaintiff .................................A000002

Defendant's Response to Plaintiff's 1st Interrogatories .........................................A000026

Deposition transcript of Philip M. Fred; pages 1, 24, 25 .......................................A000036

Deposition transcript of Lorraine Duffy; pages 1, 43, 44 .......................................A000039

Deposition transcript of April Wright; pages 1 thru 8 ...........................................A000042

Deposition transcript of Edward Griffin; pages 1 thru 4 and 21 thru 24 ................A000044

Deposition transcript of Gail Lanouette; pages 1, 27, 28, 29 ................................A000046

April 25, 2005 letter from Roy S. Shiels, Esq. to Mr. James Ravis
    Re: Grievance of Lorraine Duffy .................................................................A000050

Step 3 Grievance Decision ..............................................................................A000051

*attachment 1*

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**

ENTER CHARGE NUMBER

☐ FEPA 0506028DM
☐ EEOC 17CA500405

and EEOC (if applicable)

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Ms. Lorraine Duffy | (302) 335-3335 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 4366 Carpenter Bridge Road | Felton, DE 19943 | Kent |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME | NO. OF EMPLOYEES OR MEMBERS 25+ | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| State of DE. Dept. of State Div. of Corporations | | (302) 739-3077 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 401 Federal Street Suite 4, Townsend Bldg. Dover, DE 19901 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☒ AGE

☒ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 11/2002
LATEST 6/6/2005
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

Jurisdiction: Charging Party is employed by Respondent in its Dover, DE location as a Programmer Specialist.

Charging Party's protected class: Age-59 D.O.B.- 2/26/1946, Gender, Retaliation

Adverse employment action: Sexual Harassment, Harassment, Assignment

Brief statement of allegations: Charging Party has been subjected to a hostile work environment based on her gender and age by Dan Carroll (male; 49); Jim Ravis (male, 59), and Philip Fred (male, 52). On one occasion Mr. Ravis commented "Lorraine can be a hard-headed woman." After Pat Rogers (female, 47) was hired from the same state agency as Charging Party, Mr. Carroll commented that "We are getting all of DTI's rejects," referring to Pat and I who were the only female employees in the section. Charging Party was asked how she got the job by Dan. Philip Fred and Dan Carroll are extremely abrasive and demeaning. Mr. Fred had to be instructed to stop utilizing a specific sexual gesture. He was assigned as my trainer but has not provided any training. Charging Party believes she is being retaliated against for reporting his actions. Charging Party was told that she was unable to be Mr. Fred's "back-up."

Respondent's explanation: None

Applicable law(s): Title VII of the Civil Rights Act of 1964, as amended, Age Discrimination in Employment Act, as amended, and the state of Delaware's Discrimination in Employment Act, as amended.

Comparator(s) or other specific reason(s) for alleging discrimination: Charging Party has a "Grievance" pending with Respondent. Since the Grievance, Charging Party's assignments have been changed. She has been giving demeaning projects as opposed to the projects she was working on prior to the Grievance being filed. Mr. Ravis has not taken any actions to prevent Mr. Fred's and Mr. Carroll's conduct. Charging Party was asked by Mr. Ravis if she has given any though to leaving the agency.

Additional information and verification of these facts are provided by the attached Affidavit.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT <br><br> *Lorraine Duffy* 6-8-2005 <br><br> I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|

DDOL FORM 806
REV 11/01

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LORRAINE DUFFY, an
Individual,

    :    C.A. NO. 06-460-SLR

    :

       Plaintiff

    :

V

    :    ANSWERS TO FIRST SET OF
       INTERROGATORIES DIRECTED TO

DEPARTMENT OF STATE, an
Agency of the State of Delaware

    :    PLAINTIFF

    :

       Defendant

    :

1. For each allegation in your Complaint, state with particularity and specificity the complete factual basis for that claim as against each defendant and identify all persons having knowledge as well as each and all documents or other items of evidence that relate to each claim. Please include the specific date(s) of the factual basis of those claims.

ANSWER: 1. (A) Late 2001 through 2002. The allegations regarding Plaintiff's employment dates with the Department of State (DOS), and prior work history with a different State agency, are based on Plaintiff's recollection and can be confirmed through personnel records maintained by DOS. Plaintiff began work at DOS on or about February 25, 2002 after interviewing with Supervisor Ravis in late 2001 and early 2002. As a consultant or employee she had previously worked successfully on various technical applications with the Delaware Justice Information System (DELJIS), Contributory and Retirement Applications (State Pension Office), Employee Information Systems (Statewide Payroll, Personnel), and Resource/Payroll (Central Division of Accounting) over a period of approximately twenty-five years. She left her position as Software Specialist at the Department of Technology and Information (DTI) (Paygrade 16) to work for DOS on the basis of career advancement. Duffy was out of work due to illness, including surgery, for several months beginning in July of 2002.

1



(1) The four programmers employed at DOS included Plaintiff, Phil Fred, Edward Griffin, and (a year after Plaintiff's employment) Patricia Rogers. Rogers initially worked only on mainframe applications for several years. James Ravis and Dan Carroll were supervisors. Charles O'Brien was employed as an on site consultant in the technical applications relating to mainframe applications. Arthur Todd was a mainframe consultant who worked from Colorado.

(2) Plaintiff's initial assignment was to be the back up for Phil Fred, to work with him on a daily basis, and to receive training from him in the UNIX operating system and its software, and the Eastman Kodak Imaging system and its software. Fred had developed Imaging and Workflow applications for the DOS system. The DOS system then and now lacked documentation explaining the many varied software applications it used, making new entry into working with the application more difficult. In addition the DOS system interacts with a DTI mainframe component. Charles O'Brien and Arthur Todd were consultants for the mainframe applications. Although both Carroll and Ravis initially encouraged Fred to supply the initial training as intended, Fred refused to do so. After Plaintiff's illness and return Fred had missed two project deadlines and Carroll and Ravis no longer attempted to have him fulfill his obligation to train Plaintiff. Fred was very short with, and critical of, any and all of Plaintiff's work.. He did not take the same attitude toward the work of the male programmers or consultants. Carroll and Ravis indicated to Plaintiff that Fred would no longer have time for training her until his project was complete. If Plaintiff asked questions of Fred his responses were rude, vulgar, and confrontational. He frequently used profanity (the "f" word) and obscene gestures (masturbation) in dealing with Plaintiff, in addition to being uncooperative and evasive about work issues. He did not act this way with male co-workers. At this time Fred also treated other female employees (non programmers) in the office badly causing some to be in tears.

2

Plaintiff recalls seeing April Wright, then employed in technical support, in tears when leaving Fred's office. He was particularly nasty to Plaintiff, kicking the back of her chair, walking away during conversations, and loudly interrupting her interaction with other co-workers.

(B) 2003

(1) Both Ravis and Carroll were aware of Fred's attitude about working with a female (Plaintiff) and his treatment of her. In fact both asked Plaintiff why she allowed Fred to treat her as he did. Neither, however, took any affirmative action to end Fred's behavior, or cause him to impart training. Ravis did permit a meeting in his office involving Fred and Plaintiff, but he was not present. In that meeting in January 2003 Plaintiff told Fred his behavior toward her because of her gender was unacceptable and should stop. Fred indicated that he knew he could get away with his behavior, Plaintiff believes because he thought women would not object as strenuously, but would stop. Plaintiff prepared an e-mail regarding the meeting, dated January 27, 2003, but did not send it. The meeting was discussed with Ravis and Carroll.

(2) In the early 2003 time frame Carroll indicated he had no problems with her skills but was frustrated with the behavior of Fred. Plaintiff was assigned a project with new scanning software (IDEA) from Powerscan which Fred refused to become involved with claiming it was a mistake. Because of other critical projects on which Fred was working his failure to cooperate with Plaintiff and on such projects was tolerated by Carroll and Ravis. At about this time Pat Rogers, female, was hired to work on the mainframe. Her previous job at DTI (Department of Technology and Information) had ended. Carroll's work relationship with Plaintiff became more strained as he increasingly identified with Fred and Fred's disinclination to work with Plaintiff, and annoyed with Plaintiff's insistence Fred should be required by supervision to treat her professionally. Plaintiff asked to work directly with Fred in the hope their relationship would

3

improve but Carroll refused. Carroll in conversation with a male co-worker referred to Rogers and Plaintiff as DTI rejects. In fact, Plaintiff had a good work record with DTI and believes Rogers did as well. Meetings were held in Ravis' office in May of 2003 to discuss the deteriorating relationship between Carroll and Plaintiff, as well as the failure of either Ravis or Carroll to address or resolve the previous problems about Fred's behavior raised with them by Plaintiff. Plaintiff also discussed these problems with the DOS personnel office.

(3) Many meetings are held throughout 2003 with Ravis and Carroll where the hostile work environment was discussed. At one meeting Carroll shouted at Plaintiff and raised his fists in front of Ravis. Ravis went outside for a smoke and told Carroll and Plaintiff to solve their problems. When he returned he said another meeting would be scheduled in a few days. It was not. Plaintiff also attempted to have meetings with Carroll to resolve what had become a hostile working atmosphere. Carroll's attitude toward Plaintiff became increasingly negative, which was commented on to Plaintiff by other co-workers. One co-worker (Griffin) advised Plaintiff he believed the problems she was having with Fred and Carroll were because she was a woman, and that they did not act the same way with male co-workers.

C. 2004

(1) In late 2003 or early 2004 Plaintiff received her only performance evaluation from DOS. It was "meets expectations". Fred continued in 2004 to be uncooperative and difficult and went for weeks at a time refusing to speak to Plaintiff. Plaintiff continued to meet with, and complain to Carroll (alone), and Carroll and Ravis (jointly) but neither took any action to deal with the lack of courtesy and professionalism from Fred or Carroll, which continued to create stress in the workplace for Plaintiff. Co-workers Griffin and Rogers continued to comment to Plaintiff about the behavior toward her exhibited by Carroll and Fred, and how it appeared to be

4

discriminatory and hostile. Griffin also indicated he felt that Ravis was wrong for allowing the behavior to continue unchecked and unpunished. The stress at work made Plaintiff physically ill. Later in 2004 she sought assistance from the State's Employee Assistance Program (EAP).

(2) The hostile work environment continued to worsen as indicated by e-mails sent in late July, 2004. Fred stopped talking to Plaintiff completely. On July 30, 2004 Carroll called a meeting to announce Plaintiff and co-worker Griffin (who did primarily mainframe work) would be switching duties and that Fred had been talked out of retiring (he had apparently submitted his resignation). On August 2, 2004 Plaintiff sent an e-mail to Gail Lanouette (DOS Personnel Director) indicating she did not want to switch duties and giving a history of the hostile work environment. Lanouette indicated she felt the switching of duties was a good solution. Plaintiff indicated she felt she was being punished because of the hostile environment that had been created by Carroll and Fred, and her complaints about that hostile work environment.

(3) Reversal of the decision to switch duties came about five days after the initial announcement of intended change. In interim discussions Lanouette indicated immediate changes in Fred's behavior could not be expected immediately but would be brought about over time. She indicated that Fred and Carroll "talked the same language" so thereafter Fred would communicate with Carroll, and Plaintiff should interface with Carroll instead of Fred. On August 4, 2004 in a meeting involving Ravis, Carroll, Lanouette and Griffin it was indicated that higher management (Geisenberger) had determined Griffin and Plaintiff should return to their previous assignments.

(4) On August 9, 2004 Fred indicated training would be held and work was done on the IDEA jobs. Lanouette scheduled a meeting for September. Plaintiff knew Fred had talked with Carroll alone so she also talked to Carroll, wanting all three to work together. Carroll indicated

5

to her that Fred said to him Plaintiff had refused training, a false statement. Carroll was loud and clearly upset and berated Plaintiff for wanting her own way, saying the three would meet that afternoon. Ravis heard the commotion and called Carroll into his office. Ravis and Carroll decided someone from Personnel should attend the meeting.    When Plaintiff was so advised she suggested to Carroll that she, Carroll, and Fred should attempt to meet first.    Carroll again loudly berated her.

(5)   On August 11, 2004 Plaintiff requested to meet with Ravis.  They met and she indicated she was uncomfortable and fearful in dealing with Carroll because of his belligerence toward her and preferred to work at establishing reasonable and professional direct communication with co-worker Fred rather than channeling all necessary communications through Carroll. Ravis indicated that he preferred Plaintiff deal with Carroll and indicated she should indicate no differences of opinion or suggestions to Carroll and let him make all decisions.

(6)   On September 1, 2004 Plaintiff met with Carroll to discuss resuming training. Carroll indicated he and Ravis disagreed about training because Ravis wanted Fred to train Plaintiff and Carroll felt Fred would never train Plaintiff.  Later that day Carroll announced there would be bi-weekly meetings of the programming staff and beginning September 6, 2004 all programmers would fill out time sheets and prioritize and write up assignments.  When Fred went on vacation Carroll spent time overriding application/systems problems which arose  from his work without addressing the causation of problems as desired by Plaintiff.  This protection of Fred created additional strain between Carroll and Plaintiff.

(7)   Carroll and Plaintiff met with Lanouette in October.  There had been no recent outbursts from Carroll.  Carroll indicated Plaintiff was doing a good job

6

A000007

Plaintiff pointed out that because Fred never communicated with her there were areas of work (such as the faxing operation) she had no exposure to or experience with. Carroll indicated he would think about this. Plaintiff indicated she had come to realize Fred would never train her and she would continue to try to learn on the job. Lanouette thought this was a good idea. Male programmers received training not afforded Plaintiff.

(8) In December Plaintiff noted there had been no further programmer meetings. There was no work communication occurring with either Fred or Carroll. Attempts to talk with Fred about work issues got surly or nasty responses so Carroll continued to act as go between which resulted in no progress because Carroll was again becoming increasingly short and negative with Plaintiff. He yelled at her again. She asked Carroll about the programmer meetings and he said they were a waste of time. She later discovered some programmer meetings were held but she was neither invited nor notified.

D. 2005

(1) Plaintiff wondered if she should again go to DOS Personnel since things had not improved and she wondered if they knew that no training was occurring. Plaintiff in January began seeing a counselor provided through the State Employee Assistance Program (EAP). The counselor suggested a psychiatrist and scheduled a meeting with one in February. Plaintiff attempted to raise an issue regarding work with Carroll who again yelled at her and berated her. She requested a meeting with Ravis by e-mail. Ravis met with her and Carroll in mid-January and Plaintiff stated she could no longer tolerate the way she was being treated, with no action by either of them to end that hostile treatment. Ravis indicated Carroll should not yell at her in the office, and he would straighten out with Carroll the reactions of Fred and then Carroll could discuss same with Plaintiff. On January 18, 2005, Ravis advised Plaintiff Carroll and Fred were

7

taking that day off. Ravis shared e-mails he was sending to Carroll and Plaintiff about the lack of communication between Fred and Carroll and Plaintiff, and Carroll was to meet with Fred and then with Plaintiff. Plaintiff believes no direct contact was mentioned because Ravis feared Fred would not agree to continue working on projects if forced to deal directly with a female, the Plaintiff.

(2) Plaintiff met with Carroll on January 21, 2005, and he indicated that DOS would return to a training arrangement involving Fred and Plaintiff. Carroll did not want to meet with Fred and Plaintiff because he did not feel trained to handle what he saw as a difficult situation. Plaintiff suggested involving someone from personnel. Carroll also indicated having told Ravis Plaintiff would never be Fred's backup. Carroll also criticized Plaintiff's work with a "reject letter" (i.e. system problem). Fred later that day told Plaintiff he wanted to meet with her. She suggested the meeting be private and not involve co-workers. The meeting was held in Carroll's office with Carroll present. There was a lengthy meeting discussion training and knowledge transfer. Carroll criticized Plaintiff regarding her lack of knowledge and understanding of UNIX scripts. Plaintiff had never been trained by Fred or Carroll regarding such scripts. No agreements regarding training were reached. Carroll also indicated Plaintiff should be more understanding of Fred's dislike for training. Plaintiff found the meeting very stressful. Carroll later asked if she was all right, stating he related to Fred better than Plaintiff. Plaintiff understood this as indicating that she as an inferior (female) had no right to communicate using the means of questioning or criticizing the actions or statements of Carroll or Fred.

(3) Carroll and Ravis frequently monitored Plaintiff's progress in the merge program. Carroll at one point accused Plaintiff of testing in production because he did not understand the test environment. This is one of the many basic criticisms of her shown to not be thought out or

8

accurate. Carroll and Ravis treat Plaintiff as if she were not a senior level programmer while not treating the male programmers similarly. These events occurred in approximately March, 2005. On March 31, 2005, after intense discussion about the merge program, Carroll asked, at the end of the day, about why Plaintiff was having her test running, saying it should be cancelled. When Plaintiff suggested it should continue to run, Carroll became furious, pounding on the desk and rising to his feet. Plaintiff was shocked and said Carroll really needed to do something about his anger. She felt very stressed, and walked away. She was frightened by his uncontrollable temper in dealing with her, although he did not react to comments or suggestions of the male UNIX programmers or the consultants in this way.

(4) Plaintiff had been testing a critical program for a number of months when an incident occurred on April 13, 2005. The program merges current images (using the new imagery system after February, 2004) with archived images for Corporation, UCC, and Franchise Tax applications. Several significant changes had been made in the program at the suggestion of Fred and Carroll. Testing was giving unexpected results. Carroll told Plaintiff to run the program again (to get a display of the directory being written from and the directory written to) and went to the computer room. He came storming back claiming plaintiff had run the testing when the administrators were clearing data from earlier tests. Plaintiff told him that the last test run was finished and nothing else had been written after that by her. Carroll would not listen and ordered her to key a command in her computer. She asked him to look at what she was trying to show him, which established she had told him correctly, that her last test was over. He yelled at her and said he was going to slap her. She followed fearfully his instructions and Carroll walked away. All of the programmers, including Fred, heard what was occurring. Fred came from his cubicle and Plaintiff asked him to confirm the last test was concluded. He then said to check and

9

see if it was running. Neither Fred, Carroll, nor Plaintiff was aware that an earlier test program (not Plaintiff's last test which had concluded) was still running. Carroll yelled at her again, very loudly, claiming she was not following instructions from Fred. Fred suggested to Carroll they should leave (for lunch or for a drink, Plaintiff can no longer clearly recall) and they did leave. Carroll had never, during Plaintiff's DOS tenure, treated any male programmer as he did her. When Ravis saw Plaintiff in the hall and asked her how the test was going, Plaintiff told him everything that had occurred. They returned to Ravis's office where Ravis spoke with Lanouette. Ravis later called Carroll into his office. Ravis directed Plaintiff to have no further direct contact with Carroll, and that Carroll was to have no direct contact with her. Plaintiff later determined Ravis gave no similar direction to Carroll. The following day Ravis called co-worker Griffin into his office to recount events. Ravis had another closed door meeting with Carroll, and Carroll left work for the day. Plaintiff felt physically sick and was afraid of what Carroll might do next.

Plaintiff called Ravis at home on Sunday, April 17, 2005, not wanting to go to work the following Monday with things as they were. Ravis told her that Carroll would receive a written reprimand for his behavior, that she and Carroll were to have no interaction, and he was again thinking of changing her job assignment. Plaintiff told him she did not want to change her assignment and felt this made no sense. Ravis told her to document what had occurred and to document how the merge program worked so he could assign it to a default programmer. On Monday, Ravis indicated that he and Personnel had decided to assign her to different work. Later that day, Plaintiff called Lanouette and asked to speak with her, and asked if it was safe to return to work. Lanouette refused to meet without Ravis present and said it was safe to return. At a meeting at work on April 20th, 2005 (Ravis, Plaintiff, Lanouette, and Nowacki (personnel)), Plaintiff reiterated her belief the change was unfair and punished her for reporting

10

discrimination, and retaliation occurring in a hostile work environment. Ravis was visibly upset with Plaintiff. Lanouette asked what Plaintiff wanted. Plaintiff responded she wanted to finish her project and maintain her present duties, have Fred interact with her in a mature and professional way when interaction was needed, and to not have to keep turning to personnel for assistance. Personnel said they would get back to them.

Afterwards Ravis had private discussions in his office with Carroll, and then Fred. Ravis then called Plaintiff to his office and said he was giving her program to Fred. Fred would then test the program and report if it had a chance of working . Plaintiff was upset. In her thirty years in programming, no other superior has ever indicated another party would review her work for acceptance. Plaintiff told Ravis this was unacceptable and was being done to again placate Fred and Carroll. Ravis became upset with her and asked if she had ever thought of leaving DOS. Another meeting was held with personnel and the "program review" by Fred was abandoned. The next day, Plaintiff was to begin testing her program, but found Carroll had deleted her testing output, allegedly due to a space problem. Plaintiff believed this was done on purpose and sent an e-mail to Ravis and to the system administrator supervisor.

A discrimination grievance was filed shortly thereafter, in June 2005, with the State Merit System based on the physical threats and offensive behavior of Fred and Carroll. In May there had been complete test results for Fred to review, but he refused to do so, changing the subject. He discussed Kodak scanner problems, wanting to blame them on IDEA software. When Plaintiff disagreed that was the source of hardware problems, he told her to leave his office. He would not work with her as a co-worker, as directed. On May 13, 2005, Ravis told her she could finish the merge program for Corporations, but her project would then be given to someone else to finish. She was to begin work on main frame batch views as soon as possible. On May 23 and

11

24, Plaintiff ran a successful Corporations merge test. Plaintiff wrote to Lanouette concerning the hostile work environment in the form of abuse from Carroll and Fred, and retaliation (in the form of removing projects and isolating her) when she complained, as well as her unsuccessful efforts to resolve the stress arising from being treated differently because she was a woman. Plaintiff's grievance was decided in Plaintiff's favor by a written decision from the State Personnel Office on August 15, 2005.

Despite this grievance decision, rendered in Plaintiff's favor and requiring new behavior by DOS personnel, Ravis and Carroll continued to threaten to remove Plaintiff from UNIX work, and DOS continued to prohibit Plaintiff from dealing directly with Carroll or Fred, having her now deal instead through Ravis. Ravis since approximately April 2005, through the end of Plaintiff's work at DOS, remained her official supervisor. Plaintiff believes her work assignments from Ravis were arrived at by discussion between Ravis and Carroll. Plaintiff was given a Performance Plan different from the male programmers and objected. Her Performance Plan was then modified to be more consistent with the Performance Plans of other (male) programmers.

E.2006

(1) Ravis continues to indicate parts of the merge project might be assigned to Fred. In February of 2006, he claimed he would, in time, fix the hostile work atmosphere and would end Plaintiff's isolation from other programmers "when Dan and Phil are ready". When directly asked by Plaintiff which he would choose, catering to Dan and Phil and whatever they wanted thereby leaving her totally isolated and punished for reporting discrimination and retaliation, and compelling them to take the necessary and appropriate actions to work with her, what would he choose, Ravis responded he would leave her totally isolated. He also would not require Carroll to

12

**A000013**

include Plaintiff in the Programmer meetings attended by all of the other programmers, and that if Plaintiff insisted on trying to attend those meetings he would require her to sign a waiver.

(2) Plaintiff's last day physically at work was February 8, 2006. Plaintiff began to feel physically sick at returning to an openly hostile work environment and realized she could not continue without further jeopardizing her health. She so advised DOS personnel who told her to apply for short term disability, which she did. That, and subsequently long term disability, has been awarded Plaintiff by the State's health care carrier (Hartford). Plaintiff has also applied for Social Security disability benefits, which application remains pending. She has also sought assistance through counseling (Dr. Guarriello), and by seeing a psychiatrist (Dr. Cindrich). They are presently of the opinion that she cannot return to work because of the stress arising from the manner she was treated at work. She is also taking prescribed medications. The medications are listed in the answer to Interrogatory 15.

2. Identify by name, address and telephone number, all health care providers (e.g. doctors, dentists, physicians, surgeons, therapists, etc.) that have treated or examined you in the last 15 years and provide the dates of service or treatment, the nature of any treatment or examination and the result of each treatment or examination.

ANSWER:

(1) Theresa P. Little, M.D.
Central Delaware Family Medicine
1001 S. Bradford Street, Suite 4
Dover, Delaware 19904    302-735-1616
Plaintiff's family doctor. Has seen Plaintiff on many different occasions for different reasons. Details no longer recalled by Plaintiff but within records of Dr. Little.

(2) Stephan J. Cindrich, M.D.
F. H. Everett and Associates
707 Walker Road
Dover, Delaware 19904    302-674-3380

13

Psychiatrist treating Plaintiff for stress problems arising from hostile work atmosphere. Continues to see plaintiff on various occasions.

    (3) Patricia Guarriello, PhD
       A Center for Human Development
       148 S. Bradford Street
       Dover, DE 19904    302-736-1820
Psychologist . Treating Plaintiff for stress problems arising from hostile work environment. Continues to see plaintiff on various occasions.

    (4) Lilian Kramen-Roach, M.D.
       846 Walker Road, Suite 31-2
       Dover, DE 19904    302-674-9188
       Psychiatrist. Treated Plaintiff for stress problems arising from hostile work
environment. Not presently seeing Plaintiff.

    (5) Janis Chester, M.D.
       Williams Service Center
       805 River Road
       Dover, DE 19901

    Physician. Referred to Dr. Chester by Disability Determinations Service for disability evaluation required by Social Security Administration.

    (6) Henry Weiner, M.D.
       Cardiology Consultants
       Omega Professional Center
       Omega Drive
       Newark, Delaware 19713    302-366-1929
Cardiologist. Seen at various times for treatment. Still seeing currently. Previously implanted pacemaker.

    (7) Robert J. Scacheri, M.D.
       Dedicated to Women OB-GYN Associates
       540 S. Governors Ave., Ssuite 201
       Dover, DE 19901    302-735-8940
OB-GYN doctor. Seen at various times for treatment. Operated on Plaintiff for Cancer in 2002.

    (8) Andreaus Bauer
       16 Old Rudnik Lane
       Dover, Delaware 19901   302-734-1760
Ophthalmologist. Seen at various times for eye care.

    (9) Devon C. Sadlowski, D.M.D.
       882 Walker Road, Suite A

Dover, Delaware 19904   302-735-8940
Dentist.  Seen at various times for dental care.

(10)  Edward J. Hynes, D.P.M.
      Dover Podiatry Group
      1418 S. State Street
      Dover, Delaware 19901    302-734-7474
Podiatrist.  Seen at various times for foot care.

(11)  Brian Costleigh, M.D.
      Beebe Medical Center
      Tunnell Cancer Clinic
      Lewes, DE 19958   302-645-3775
Cancer specialist.  Provided radiology services for care of cancer condition.

(12)  Joseph Andrews, M.D.
      Carman Campanelli, M.D.
      717 S. Queen Street
      Dover, DE 19904      302-736-1800
Dermatology practice.  Seen for skin condition.

(13)  Jason Walther, M.D.
      Urology Associates of Dover
      740 S. New Street
      Dover, DE 19904   302-736-1320
Urologist .  Seen for kidney stones in 2004.

(14)  William Kaplan, M.D.
      302 Polk Avenue
      Milford, Delaware 19963  302-422-3393
Gastroenterologist.  Seen for colonoscopy (EGD) in 2006.  Done for surgery pre-approval
(Wynn)

(15)  Lawrence Piccioni, M.D.
      1113 S. Governors Avenue
      Dover, DE 19904   302-730-8060
Orthopedist.  Seen for arthritis in foot.  Last seen in 2005.

(16)  Stephen Manifold, M.D.
      Tooze & Easter
      720 S. Queen Street
      Dover, DE 19904   302-735-8700
Orthopedist.  Seen for problems in shoulder in 2004.

(17)  Brian Walsh, M.D.
      David Jawahar, M.D.

15

Dover Pulmonary
530 S. State Street
Dover, DE 19901   302-734-0400
   Pulmonologist.   Seen for breathing tests in 1999-2000.

(18) Stephen Cooper, M.D.
     771 E. Masten Circle
     Milford, Delaware 19963  302-422-0474
Ear, Nose and Throat specialist. Seen for hearing evaluation in 1998.

(19) Bruce Bolosny, M.D.
     Hamilton, Bolosny & Newell
     905 S. Governor's Avenue
     Dover, Delaware 19904   302-674-2420
Seen for Colonoscopy, about 2003.

(20) John Glenn, M.D.
     737 S. Queen Street
     Dover, DE 19904  302-735-8850
Seen for Gall stones, artery blockage in 2001.

(21) Gail Wynn, M.D.
     CHRIAS
     537 Stanton-Christiana Road, Suite 102
     Newark, DE 19713   302-982-9900
Bariatraic Surgeon.  Seen for gastric banding in 2006.  Still seeing currently.

(22) Joan Cantero, M.D.
     The Medical Clinic
     219 W. Green Street
     Middletown, DE 19709   302-376-1113
Endocrinologist. Has since relocated. Seen for diabetes in late 1990s

(23) Joseph Marocco, LSW, CEAP
     Human Management Services
     Glen Loch Corporate Campus
     1463 Dunwoody Drive
     West Chester, PA  19380
     (800-343-2186)
Provided intake and assessment upon referral by State EAP program.  Saw in early 2005.

(24) Neil S. Kaye, M.D.
     Stoney Battle Office Building
     5301 Limestone Rd., Ste. 103
     Wilmington, DE  19808

16

Psychiatrist. Evaluated mental stress claims of plaintiff in 2006. Retained by PMA on behalf of State of Delaware.

3. State and identify by names of parties, court or administrative body, date and case number all lawsuits or legal proceedings, at law or equity, of any nature in which you have ever been a party and the disposition of that matter.

ANSWER: Plaintiff objects to this interrogatory for being overly vague, and on the basis the information sought is irrelevant and immaterial and not calculated to lead to the discovery of information which is relevant and material. For further answer:

(1) Lorraine Duffy and Christopher S. Duffy. Superior Court (Sussex). Civil Action No. 338, 1974. Divorce proceedings. Plaintiff was granted a divorce.

(2) Lorraine Duffy and James Y. Patton. This case was handled by Jackson Dunlap, Esquire, now deceased. It involved a March 25, 1979 automobile accident and was settled. Plaintiff received a net payment in the amount of $33,000.00. Plaintiff is not presently sure if this case was filed in a court.

(3) Lorraine Duffy and Ed Helie. Justice of the Peace 16 in Dover, Delaware. Civil Action No.: J0608026416. This case was decided in 2006 and judgment was given for plaintiff in the amount of $2,177.71 plus interest. The case involved home improvements.

4. Identify by name, address, phone number, location, date and persons present, all individuals that have been interviewed by you in connection with this matter and identify the subject matter of that interview and any documents discussed. Please state whether any documents or memorandum were prepared relating to that interview.

ANSWER: Plaintiff objects to this interrogatory on the basis of legal privilege arising from work product, and attorney-client relationship.

17

5. State and identify each and all photographs, audio tapes or any other form of recording media that relate to this matter, and provide the time, date, location and manner that such were made as well as the names of all individuals that have the originals or copies.

ANSWER: Plaintiff objects to this interrogatory as vague (i.e. meaning of "that relate to"), as well as claiming legal privilege for work product. For further answer, plaintiff is presently unaware of such photographs, tapes, or other recording media.

6. To the extent you contend that Defendant violated Title VII, state with particularity and specificity all the basis for your contention. Please include the date(s) of any of conduct or omissions that underlie your contentions.

ANSWER: Plaintiff does claim that actions of co-workers and supervisors at DOS constitute a violation of Title VII. The specific actions claimed to be relevant to plaintiff's claim of discrimination based on gender, and hostile work environment arising from such discrimination, and retaliation for reporting same to supervisors, are set forth in paragraph 1 of these Answers to Interrogatories. Plaintiff was treated differently than male programmers at DOS by co-worker Fred and supervisors Carroll and Ravis. When Fred refused to work with plaintiff and train her because of her gender that was reported to Supervisor Ravis who chose not to correct this behavior but to placate Fred and Carroll, her supervisor. Continued refusal of Fred to treat plaintiff professionally, as he did male programmers, was complained about on numerous occasions thereafter to both Carroll and Ravis. Neither took any steps to correct or alleviate the existing hostile work environment created by Fred. Instead Carroll increasingly participated in the hostile work environment, which increased participation was also reported to Ravis, the second level supervisor. Ravis made no meaningful effort to modify the behavior of Fred or Carroll toward plaintiff until Carroll threatened plaintiff with physical violence in 2005. That

18

threat caused the first disciplinary reaction to the ongoing hostile environment, a reprimand. Both Carroll and Ravis had indicated to plaintiff recognition of the wrongful conduct of Fred but both chose to placate Fred, a long time DOS programmer who had worked previously on a number of significant projects, rather than risk Fred's becoming more uncooperative or resigning. Even after becoming aware of the effect of the resulting hostile work environment on plaintiff's health through her use of the State's EAP program, they individually and together chose not only to ignore the ongoing discrimination in order to benefit themselves by utilizing the skills of Fred, but also chose to retaliate against plaintiff for her complaining about Fred's behavior by removing her from UNIX work, including the merge project, over her objections and relegating her to main frame work which she did not like and which was likely to become less significant in the future because of intended changes within DOS. Plaintiff used the administrative remedies available to her and filed a grievance within the State Merit System. Even when that grievance was decided in plaintiff's favor, and the wrong of punishing plaintiff by the reassignment of duties was established, the behavior of Fred, Carroll, and Ravis continued. Plaintiff was also excluded from meetings, threatened by loss of her projects, yelled at and physically intimated, until she was no longer able to take it and became unable to work. The behavior of Fred, Carroll and Ravis continues unchanged and essentially uncorrected, while plaintiff has been deprived not only of her position, but essentially of enjoyment of life.

7. State with particularity and specificity in narrative form the incident(s) that is(are) the basis of this suit. Please include dates, times, exact location, persons present and identify any documents that relate to the incident.

ANSWER: See answer to interrogatory 1 of these Answers to Interrogatories. The events occurred at the work place and the approximate time periods are indicated. Plaintiff

19

believes the facts establish a continuous pattern of discrimination and retaliation, rather than isolated events. Plaintiff reserves the right to supplement the narration of events in greater detail as discovery makes more facts available.

8. State, identify and describe all funds available to you since January, 1999. Please include: the location, account or other identifying number, the name or title under which the funds were held, the source of such funds and identify all documents that relate to such funds.

ANSWER: Plaintiff was employed by defendant in the position of computer programmer by defendant between February, 2001, and February, 2006. During that time period she earned approximately $62,000.00 per year. More specific figures are indicated on tax returns being produced to defendant in response to the Request for Production. Between February, 2006 and August, 2006, Plaintiff received short term disability payments from the Hartford Insurance Company (State insurance) in the amount of $21,286.00. From August, 2006 through November, plaintiff received long term disability payments from the Hartford Insurance Company in the amount of $12,996.45.

9. Identify all individuals retained as experts or that may be called as witnesses under FRE 702, 703 or 705 by Plaintiff and provide the following:

(i) An exact copy that expert's opinion or report as well as any drafts and all correspondence between you and the proposed expert;

(ii) An exact copy of all materials which the expert reviewed or will rely in forming his/her opinion;

(iii) A current and complete listing of the expert's qualifications;

(iv) Exact copy of any exhibits to be used by the proposed expert;

(v) All publications authored by the proposed expert within the last ten years;

20

(vi) The amount of compensation to be paid the proposed expert; and

(vii) A listings of all cases in which the proposed expert has testified or offered

an opinion in the last four years.

ANSWER: Plaintiff has not yet retained any experts for the purpose of testimony at trial

but reserves the right to do so and will supplement her Answer to these Interrogatories when that

decision is made. Presently plaintiff anticipates that she will have Dr. Cindrich and Dr. Guariello

testify about her psychological condition and its causation, but reserves her right to alter this

decision. Plaintiff also anticipates hiring an expert for economic calculations. The experts'

qualifications, and any reports from them, will be supplied at a later date.

10. State, list and describe in chronological order, the full name, case number,

jurisdiction, date of filing, precise nature of the complaint and disposition of all civil cases

commenced or joined by Plaintiff.

ANSWER: See Answer to Interrogatory 3.

11. Identify all persons by name, address and telephone number that Plaintiff

communicated with regarding the facts or allegations in the present matter. Please include a

description of the mode and manner of such communication and the time and date.

ANSWER: Plaintiff objects to this interrogatory on the basis of the work product

privilege, and the attorney-client relationship.

12. Identify all individuals by name, address and phone number and all evidence by

complete description that you intend to call or offer at trial. Please include a summary of the

witnesses' expected testimony or the reason for offering the exhibit.

ANSWER: Plaintiff objects to this interrogatory on the basis of the work product

privilege, and the attorney-client privilege. For further answer, plaintiff has not yet determined

21

what persons will be witnesses at trial, or what evidence will or will not be presented at trial on Plaintiff's behalf.

13. State, identify and describe all documents or records that relate to this lawsuit in Plaintiff's or her lawyer's possession. Please include the name of the document or record, the nature of the information or record, the form in which the information is kept, the date and how you acquired such documents.

ANSWER: Plaintiff has provided in those documents produced or to be produced in response to defendant's Request for Production all of those documents presently known to plaintiff which plaintiff believes are relevant to this case and admissible at trial. Plaintiff reserves the right to supplement her responses to the Request for Production to the extent further documents believed by plaintiff to be relevant or admissible are discovered or produced hereafter.

14. State and identify all damages you claim you are entitled to by the Defendant's alleged wrongful conduct and include your calculations of those amounts, if any.

ANSWER:    Plaintiff has not yet calculated the various elements of damages except that back pay would be based on her annual salary of $63,000.00, less payments received for disability, since February 8, 2006. This amount, as of November of 2006, would be approximately $29,000.00. More precise computations including interest at the lawful rate, will be provided later. Other forms of damages which will be sought by plaintiff include front pay until the intended date of retirement (at age 65 in 2011), compensatory damages including damages for depression and humiliation, punitive damages for intentional wrongful acts, out of pocket losses (medical co-pay, etc.), counsel fees, costs of this action, and such other and further

22

damages as Plaintiff may be lawfully entitled. Medical co-pay expenses exceed $1,500.00 as of November 2006. Plaintiff also has out of pocket expenses for transportation to doctor's visits.

15. Identify by name, dosage and by whom prescribed, all medications that have been prescribed for you, and the reason such medications were prescribed for you for the last five (5) years.

ANSWER: The medications proscribed for Plaintiff in the past five (5) years, and the identity of those prescribing same and the reason therefore include the following:

(1) Cymbalta 30 mg. Prescribed by Dr. Kramen Roach for depression. Stopped taking in March 2006.

(2) Clonazepam 5 mg. Prescribed by Dr. S.J. Cindrich (taken when needed)

(3) Lexapro 10 mg. Prescribed by Dr. S.J. Cindrich to replace cymbalta. Given for depression. Cindrich believed Cymbalta had created complications (taken every day)

(4) Adderall XR 15 mg. Prescribed by Dr. Cindrich for inability to focus, Complete tasks. (taken every day)

(5) Coumadin 5 mg. Prescribed by Henry Weiner,Theresa P. Little M.D. Given for heart condition. (taken every day)

(6) Atenolol (Tenormin) Prescribed by Henry Weiner,Theresa P. Little M.D. Heart condition (taken every day)

(7) Synthroid .50 mg. Prescribed by Theresa P. Little, M.D. Given for Hypothyroid (taken every day)

(8). Mobic 7.5 mg. Prescribed by Lawrence Piccioni, Theresa P. Little M.D. Given for Arthritis (taken every day)

(9) Nitrostat .4 mg. Prescribed by Henry Weiner,Theresa P. Little M.D. Given for chest and arm pain (taken when needed)

(10) Lasix 40 mg. Prescribed by Theresa P. Little, M.D. (Taken when needed)

(11) Flonase 50 mg. Prescribed by Theresa P. Little M.D. Given for Nasal congestion and allergies (taken when needed)

23

(12) Diflucan 150 mg. Prescribed by Theresa P. Little M.D.
     Given for fungal infection. (taken when needed)

(13) Amoxicillin or other antibiotic. Prescribed by Devon C. Sadlowski D.M.D.
     Heart protection from dental work/cleaning (taken when needed)

BROWN, SHIELS & O'BRIEN

BY _____

ROY S. SHIELS, ESQUIRE
P.O. DRAWER F
108 E. WATER STREET
DOVER, DELAWARE 19903
ATTORNEY FOR PLAINTIFF
302-734-4766  ID# 346

DATED: 1/17/07

24

A000025

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

LORRAINE DUFFY,          :

      Plaintiff,          :

               :

      v.          :          C.A. No. 06-460-SLR

               :

DEPARTMENT OF STATE, an          :

Agency of the State of Delaware,          :

               :

      Defendant.          :

## <u>DEFENDANT'S RESPONSE TO PLAINTIFF'S 1ST INTERROGATORIES</u>

*1. State with particularity the identity of all persons claimed to have knowledge about any allegations in the pleadings filed in this case.*

**<u>RESPONSE:</u>**          Objection, defendant does not know the identity of all persons who have knowledge about any allegations in the complaint. Without waiving this objection, defendant believes that in addition to the plaintiff and her attorney, the following may have some knowledge of the facts in the complaint.

> Daniel J. Carroll, Strategic Information Systems Project Leader
> Phillip M. Fred, OIS Programmer Specialist
> Patricia A. Rogers, OIS Programmer Specialist
> Edward K. Griffin, OIS Programmer Specialist
> Department of State, Division of Corporations
> 401 Federal Street, Suite 4
> Dover, DE 19901
>
> Albert F. Carter, Jr., Deputy Principal Assistant
> Department of State, Office of the Secretary
> 820 French Street
> Fourth Floor
> Wilmington, DE 19801

James T. Ravis, Information Systems Manager
Gail A. Lanouette, Human Resources Manager
Carlene A. Myers, Human Resources Specialist II
Richard J. Geisenberger, Assistant Secretary of State
Department of State, Office of the Secretary
401 Federal Street, Suite 3
Dover, DE 19901

Kim Nowacki, Human Resources Manager
Department of Transportation
Dover, DE 19904

    *2. State with particularity each document, and its custodian and location, which tends to establish or refute any factual allegations in the pleadings filed in this case.*

    **RESPONSE:**    Objection, defendant does not know the identity, custodian or location of documents that may tend to establish or refute the factual allegations in the complaint. Without waiving this objection, defendant in accordance with Rule 33(d), defendant will produce non-privileged documents that are responsive. These documents are from the inactive personnel file maintained by defendant on the plaintiff. It is believed that plaintiff and her attorney are already in possession of many of these same documents.

- 2 -

**A000027**

*3. Identify by date, and persons present, all meetings held within DOS in the past five years to discuss complaints made to supervisors or other superiors by Plaintiff about the manner in which she was treated by Carroll or Fred.*

**RESPONSE:**        Objection, plaintiff was not employed with DOS for five years. Without waving the objection, regarding the incident of April 12 or 13, 2005:

In late July 2004, Lanouette met with Carroll and Ravis regarding programming assignments in the Data Center.

On August 2, 2004, Lanouette met with plaintiff. Plaintiff told her about various issues causing her concern and they discussed work assignments and how they were made. Lanouette informed plaintiff that it was the Supervisor/manager's responsibility to make assignments based on the needs of the organization. Later Lanouette met with Ravis, Carroll and plaintiff. Everyone was in agreement about the work assignments and that everyone be professional and treated with respect.

On October 20, 2004, Lanouette had a meeting with Carroll and plaintiff as a follow up to the August meeting. Plaintiff stated that she believed her working relationship with Carroll was better. Plaintiff stated that on August 11 & 12, 2004, she had training with Phil Fred and it was a very good session. Plaintiff stated that she had had other training. She stated that: Fred does not communicate with her,

- 3 -

**A000028**

that Ravis and Carroll had told the Corporation Divisions Managers to take all computer processing questions to plaintiff, but instead they go to Fred because they know with all his experience he can solve questions faster and plaintiff would have to go to Fred in any event.

On April 14, 2005, Kim Nowacki met with Jim Ravis regarding the incident that occurred on either April 12 or 13 between Carroll and plaintiff.

April 18, 2005, Lanouette met with Ravis to the incident. Ravis would give Carroll a written reprimand.

On April 19, 2005, Lanouette went to plaintiff's desk to see how she was. Plaintiff stated that she was fine and thanked Lanouette for checking.

On April 20, 2005, Lanouette met with plaintiff, Ravis and Nowacki concerning plaintiff's complaint about Fred and Carroll not working with her and their behavior towards her was same as August 2004. It was suggested that plaintiff's assignments be changed, but plaintiff objected and she continued to work on an existing project.

Plaintiff requested a change in her supervisor from Carroll to Ravis and this changed was made for plaintiff.

Ravis meets with Carroll explains "zero tolerance" for any form of harassment – then both met with Fred and told him same thing.

- 4 -

**A000029**

Pursuant to Rule 33(d), defendant is producing documents from which additional information may be ascertained. They are bates stamped D00100 – D00237. Documents bates stamped D00235, D00236 are not being produced as they are single page documents from and to lawyers in connection with pending matters and are protected from disclosure under attorney/client or work product privilege.

4. *As to each meeting identified in the preceding interrogatory state what action was taken by DOS as a result of such meeting, when the action was taken, and what parties have knowledge of same.*

**RESPONSE:**    Please refer to prior responses and documents produced.

5. *Identify all documents indicating when the meetings referred to in the preceding interrogatories occurred, and what transpired at such meetings, or as a result of such meetings.*

**RESPONSE:**    Please refer to response to No 3.

- 5 -

**A000030**

*6. As to Dan Carroll and Phil Fred indicate all Performance Reviews done in the past five years by date and state whether you object to production of same, including the basis for said objection.*

**RESPONSE:**        Objection, the request is beyond the scope of discovery under Rule 26. Without waiving the objection, defendant will produce under an appropriate confidentiality order.

*7. State what punishment or adverse employment action was taken by DOS against Dan Carroll or Phil Fred within the past five years as a result of their treatment of Plaintiff in the workplace.*

**RESPONSE:**        On April 18, 2005, a written reprimand was issued to Dan Carroll for comments he made to plaintiff that she felt were threatening. On May 4, 2005, Jim Ravis met with Phil Fred and informed him that there is a "zero tolerance" for any further abusive or non-professional communication with plaintiff or anyone else and that the next instance that occurs will result in disciplinary action.

*8. Identify all persons in the Personnel Office of DOS who were contacted because of complaints by or involving Plaintiff relating to treatment of her by Carroll or Fred, including who contacted them and why, and what documentation of such contract exists.*

A000031

**RESPONSE:**    Ann Myers, an HR Specialist II was contacted in hallway by Plaintiff who said that she was experiencing problems at work and wanted someone to know about it, but requested that Ms. Myers not say anything to anyone including the HR Manager for the Department. Gail Lanouette, HR Manager was contacted a number of times by plaintiff as set out in prior responses. Regarding documentation please see response to No. 3.

9. *Identify all policies of DOS relating to workplace discrimination based on gender, as well as all practices not reduced to writing.*

**RESPONSE:**    State of Delaware Policy on Sexual Harassment, State of Delaware Merit Rules, State of Delaware Affirmative Action Policy, All state/federal EEO policies that may be applicable.

10.    *Identify the present status of any intended changes in the manner in which UNIX or mainframe functions will be carried out, identifying the nature of any such intended changes and how long plans for such changes have been in existence.*

**RESPONSE:**    The Division of Corporations are currently under contract with a vendor to rewrite both the Delaware Corporate Information System (DCIS – mainframe) and the Imaging/Workflow Applications (UNIX) into a

- 7 -

single application/presentation.  This is targeted to be a two year project with a

tentative implementation of the fourth quarter calendar year 2008.  The plans and

preparation for this project started in May 2004 when we initially met the vendor

with whom we currently have a contract.

11.   *Identify by name, last known address (including telephone), job date*

*and dates of employment all employees or subcontractors who have performed*

*computer programming functions for DOS in the past five (5) years.*

**RESPONSE:**

Arthur Todd – contractor from 1983 to present
Todd, Bennett & Blair
1873 S. Bellaire Street
Denver, CO 80222
303-759-9890

Chuck O'Brien – contractor from 1987 to 2006
202 Deep Creek Drive
Seaford, DE 19973
302-629-1645

Phu Phan – contractor from April 2006 to present
Drexel Technical
1160 West Swedesford Road, Suite 300
Berwyn, PA 19312
302-739-5364

- 8 -

**A000033**

*12. Identify all actions taken by DOS to comply with that office of State Personnel Decision dated August 15, 2005 and what persons have knowledge of same.*

**RESPONSE:**     Objection, this seeks information that is beyond the scope of Rule 26.   Without waiving the objection, plaintiff was returned to working on UNIX programming project and a new performance plan was developed to reflect that change. Employees were reminded that the department had a "zero tolerance" approach to any form of unprofessional conduct and appropriate disciplinary action would be taken against employees should it occur.

*13. State when Plaintiff was hired by Defendant, all positions with Defendant held by her and the dates of same, the pay grades held, and the gross and net salary paid to her in each year of employment.*

**RESPONSE:**  Plaintiff was hired by the Department of State, Division of Corporations as an OIS Programmer Specialist pay grade 18 effective February 24, 2002.   DOS sought and received approval from the former State Personnel Office for an advanced starting salary of $62,634 (gross) which was 106% of the midpoint for pay grade 18.   Plaintiff did not hold any other position with DOS and received the standard State of Delaware pay raise each fiscal year.   It is believed that plaintiff's W-2 forms for these years would provide the requested information.

- 9 -

*14. Identify all documents relating to Plaintiffs initial employment with DOS, including records of any interviews or recommendations.*

**RESPONSE:**     The DOS has plaintiff's Employment Application, resume, letter requesting an advanced starting salary and offer letter to plaintiff which are maintained in her official inactive personnel file.   No notes of the interview are found in her inactive personnel file.

**STATE OF DELAWARE**
**Department of Justice**

/s/ Marc P. Niedzielski
Marc P. Niedzielski (# 2616)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302) 577-8324
marc.niedzielski@state.de.us

Dated: March 28, 2007

- 10 -

**A000035**

1

```
  1            IN THE UNITED STATES DISTRICT COURT

  2              THE DISTRICT OF DELAWARE

  3
    LORRAINE DUFFY,
  4 an individual

  5         Plaintiff

  6         vs.                          C. A. No.
                                         06-460-SLR
  7 DEPARTMENT OF STATE
    an Agency of the State of
  8 Delaware

  9         Defendant

 10
                         - - - - - - - - - - -
 11

 12         Deposition of Philip M. Fred, taken before

 13 Genevieve Ritter, a Notary Public and Registered

 14 Professional Reporter, on October 16, 2007 at 10:00

 15 a.m. at Water Street, Dover, Delaware.

 16
                         - - - - - - - - - - -
 17               DELMARVA REPORTING
             217-A North DuPont Boulevard
 18             Smyrna, Delaware 19977
                   302-653-1036
 19
               delmarvavideo@mac.com
 20

 21

 22

                    DELMARVA REPORTING
                    (302) 653-1036
```

24

Fred - Shiels

1          couldn't speak to a certainty of who

2          else was on staff in 2000 and who came

3          afterwards or before.

4  BY MR. SHIELS:

5          Q.          Do you remember whether or

6  not April Wright or Cherie White or others were there?

7          A.          April, at one point, was

8  part of Tech Support.  And Cherie White currently is,

9  but I don't know her date of hire.

10          Q.          I take it that April Wright

11  is now something else?

12          A.          Yes.  But she is still an

13  employee of the Division of Corporations.

14          Q.          She is still involved in the

15  computer work?

16          A.          Not in a manner that she was

17  as a Tech Support individual.

18          Q.          How would you describe your

19  relationship with Lorraine Duffy after she came there

20  and you were impacting information and teaching her

21  procedures?

22          A.          Initially, I thought it was

DELMARVA REPORTING
(302) 653-1036

Fred - Shiels

1  quite good.  As we discussed, I've known her for quite

2  a while.  And I've, I thought we had a very good

3  working relationship.

4          Q.    .       Did that change?

5          A.            It became a bit more

6  difficult, yes.

7          Q.            As you recall, at any rate,

8  how long did it take before it became more difficult?

9          A.            I can't put a date on that.

0          Q.            Would it be within a year?

1          A.            I couldn't say for

2  certainty.  There must be a reason why you are saying

3  a year.

4          Q.            I'm just trying to get you

  to give me some idea of time.

          A.            I would presume we were

  relating well for at least a year.     .

          Q.            So the time that it became

  more difficult, you think was probably after at least

  a year?

          A.            I believe so.

          Q.            And when it became more

                DELMARVA REPORTING
                  (302) 653-1036

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

RECEIVED
OCT 18 2007
CIVIL DIVISION

LORRAINE DUFFY, and Individual, )
                                 )
          Plaintiff,             )
                                 )
v.                               )        Civil Action No.
                                 )          06-460 SLR
DEPARTMENT OF STATE, and Agency, )
of the State of Delaware,        )
                                 )
          Defendant.             )


        Deposition of LORRAINE DUFFY taken pursuant to
notice at the offices of the Department of Justice, 820
North French Street, Wilmington, Delaware, beginning at
1:30 p.m. on Wednesday, October 3, 2007, before Anne L.
Adams, Registered Professional Reporter and Notary
Public.


APPEARANCES:

        ROY S. SHIELS, ESQ.
          P.O. Drawer F
          108 E. Water Street
          Dover, Delaware  19903
          for the Plaintiff,

        MARC NIEDZIELSKI, ESQ.
        DEPARTMENT OF JUSTICE
          820 North French Street
          Carvel State Building, 6th Floor
          Wilmington, Delaware  19801
          for the Defendant.


------------------------------------------------------------
              WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com



Lorraine Duffy

43

1   be training me.  It wasn't until a couple of months

2   later they told me that I had to leave him alone because

3   he had his project to finish and that I was going to

4   have to do the best that I could on my own.

5            So what I asked for, at that point, was I

6   had asked my male supervisor to order, to issue an order

7   to the technical support people to bring every problem

8   that's UNIX related directly to me.  Because several

9   things would happen then.  I would either be ale to

10  solve it myself, which in some cases I was or my male

11  co-part, my male UNIX programmer would have to get

12  involved with me because the problem would be brought to

13  me, not him.  And they all refused.  Both of those men

14  absolutely refused to do that.  And I even brought up

15  things like he could spend more time on his project if

16  he would allow me to handle more of the problems and let

17  me get things resolved.  His project would get done

18  eventually.

19  Q.   Can you explain, why was Phil Fred this way with

20  you?  You indicated that you worked with him before.

21  A.   I did and we didn't have problems like that at

22  all.

23  Q.   Was he happy to see you when you came in 2002?

24  A.   Seemed to be, yes.



Lorraine Duffy

44

1    Q.    Did he talk about old times with you and stuff

2  like that?

3    A.    Yep.

4    Q.    So what changed between two --

5    A.    He had to start training me and he didn't want

6  to.  I believe that it was one of two issues.  I think

7  primarily it was that he felt that I was inferior to him

8  because I was a woman.  I felt that he thought that if I

9  learned too much about things, then I might become some

10  sort of a threat or I might actually make -- you know,

11  in other words, I don't know if I'm saying this right or

12  not.  He was holding the information to himself.  So

13  those are the only two reasons I can think of.

14            I think definitely he did not want to work

15  with me and I think it's because I was a female.  He

16  treated all the male programmers, all the male computer

17  operators, Dan, everyone else completely differently

18  than he treated me with the exception of the tech

19  support people.

20    Q.    And how did he treat the tech support people?

21    A.    Those were four women that answered the phone

22  and tried to help end users.  And depending on what kind

23  of mood he was in, he would be very, very abrasive, very

24  negative, make them feel just terrible and actually make

**1**

IN THE UNITED STATES DISTRICT COURT
THE DISTRICT OF DELAWARE

LORRAINE DUFFY,
an individual,
    Plaintiff

    vs.           C.A. NO.: 06-460-SLR

DEPARTMENT OF STATE,
an Agency of the State of Delaware,
    Defendant

-------------
Deposition of APRIL WRIGHT, taken before
Patrice Little, a Notary Public and Registered
Professional Reporter, on October 23, 2007 at 9:30
a.m. at BROWN, SHIELS & O'BRIEN, Dover, Delaware.

-------------
DELMARVA REPORTING
217-A North DuPont Boulevard
Smyrna, Delaware 19977
302-653-1036

delmarva@comcast.net

---

**2**

APPEARANCES:

Roy S. Shiels, Esquire
BROWN, SHIELS & O'BRIEN
108 East Water Street
P.O. Drawer F
Dover, DE 19903
Attorney for the Plaintiff
302-734-4766

Marc Niedzielski, Esquire
DEPARTMENT of JUSTICE
820 N. French Street
Fifth Floor
Wilmington, DE 19801
Attorney for the Defendant
302-577-8324

COPY

---

**3**

TABLE OF CONTENTS

                                   PAGE

Deposition of APRIL WRIGHT

BY MR. SHIELS: . . . . . . . . . . . . . . .    4

BY MR. NIEDZIELSKI: . . . . . . . . . . . .    7

Certificate Page   . . . . . . . . . . . . .   10

---

**4**

WRIGHT-SHIELS
APRIL WRIGHT,

The Witness herein, called for examination
by the Plaintiff, having been duly sworn to tell the
truth, the whole truth, and nothing but the truth, was
examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. SHIELS:

Q.        Miss Wright, where do you work?

A.        I'm sorry?

Q.        Where do you work?

A.        I work for the Division of Corporations.

Q.        And how long have you worked for them?

A.        Twenty years.

Q.        And what is your present position?

A.        I'm a corporations section administrator.

Q.        And was there a time when you were a technician in the IT section?

---

**A000042**

5

WRIGHT-SHIELS

1    A.    I worked for the technical
2 support area.
3    Q.    Okay.  And what years did
4 you work for technical support?
5    A.    It was approximately 2001 to
6 2004.
7    Q.    And was it 2004 that you got
8 promoted to your present position?
9    A.    That is correct.  It was
10 around June of 2004.
11    Q.    And so then you left that
12 area where you had worked for technical support?
13    A.    Correct.
14    Q.    And my understanding is that
15 that area was in the basement of the Townsend
16 Building?
17    A.    Yes.
18    Q.    And as part of the technical
19 support, did you have occasion to work with Mr. Phil
20 Fred?
21    A.    Yes.
22    Q.    There's been some indication

6

WRIGHT-SHIELS

1 that there was occasion which you were reduced to
2 tears by his comments or actions, do you have any
3 recollection of that?
4    A.    No.
5    Q.    Did you get along well with
6 Mr. Fred?
7    A.    Yes.
8    Q.    Did you have any — well,
9 let me say that differently.
10    Did he ever use any curse words or foul
11 language around you?
12    A.    No.
13    Q.    Did you ever hear him use
14 that toward anyone else?
15    A.    Not that I can recall, no.
16    Q.    Now, when you worked there
17 as a technical support, were you in direct support of
18 he or the mainframe or both?
19    A.    I — my job dealt with both
20 mainframe and natural applications, so he was — he
21 was a part of, you know, who we would have to contact
22 to, to get things fixed as well as the people that

7

WRIGHT-NIEDZIELSKI

1 supported the mainframe, which were others.
2    Q.    Now, what you have called
3 "Natural Applications," is that also called Unix?
4    A.    Probably, yes.
5    MR. NIEDZIELSKI:    Wait.  The
6 language is called "natural" the
7 application operating system is called
8 "Unix".
9    THE WITNESS:    We actually
10 call it "word flow".  You'll hear all
11 kinds of terms.
12    MR. SHIELS:    I have no other
13 questions.
14 EXAMINATION BY COUNSEL FOR THE DEFENDANT
15 BY MR. NIEDZIELSKI:
16    Q.    Ms. Wright, did you also
17 have an opportunity during that period of time, 2001
18 to 2004, to work with Miss Duffy?
19    A.    There were two or three
20 occasions.
21    Q.    And how did you find that
22 interaction?

8

WRIGHT-NIEDZIELSKI

1    A.    Well, at times it could be a
2 little, a little difficult.  When I was trying to
3 explain, you know, exactly what we needed done, I had
4 a little bit of difficulty, you know, making her
5 understand what we actually needed done.
6    Q.    And was the work she did for
7 you, was it timely?  I mean, would you get the work
8 back done in a timely fashion?
9    A.    No, it generally took a
10 little while, you know, longer than normal.
11    Q.    Okay.
12    MR. NIEDZIELSKI:    That's all
13 the questions I have.
14    MR. SHIELS:    You can read
15 the deposition if you want or you can
16 waive it if you want.
17    MR. NIEDZIELSKI:    In other
18 words, you can read it and check each
19 word and make sure that it's spelled
20 correctly or you can say, nah, it's not
21 that important to me, I waive it.
22    THE WITNESS:    That's fine.

1

IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF DELAWARE

LORRAINE DUFFY,
an individual,
                Plaintiff

        vs.                    C.A. NO.: 06-460-SLR

DEPARTMENT OF STATE,
an Agency of the State of Delaware,
                Defendant

-------------
        Deposition of EDWARD GRIFFIN, taken before
Patrice Little, a Notary Public and Registered
Professional Reporter, on October 23, 2007 at 9:00
a.m. at BROWN, SHIELS & O'BRIEN, Dover, Delaware.

-------------
        DELMARVA REPORTING
        217-A North DuPont Boulevard
        Smyrna, Delaware 19977
        302-653-1036

        delmarva@comcast.net

2

1  APPEARANCES:

2      Roy S. Shiels, Esquire
3      BROWN, SHIELS & O'BRIEN
       108 East Water Street
4      P.O. Drawer F
       Dover, DE 19903
5      Attorney for the Plaintiff
       302-734-4766
6
       Marc P. Niedzielski, Esquire
7      DEPARTMENT OF JUSTICE
       820 N. French Street
8      Fifth Floor
       Wilmington, DE 19901
9      Attorney for the Defendant
       302-577-8324
10
11
12
13
14
15
16
17
18
19
20
21
22

COPY

3

TABLE OF CONTENTS

                                          PAGE

Deposition of EDWARD GRIFFIN

BY MR. SHIELS: . . . . . . . . . . . .     4

BY MR. NIEDZIELSKI:  . . . . . . . . . .   21

Certificate Page  . . . . . . . . . . .   33

4

1                    GRIFFIN-SHIELS,
2                    EDWARD GRIFFIN,
3          The Witness herein, called for examination
4  by the Plaintiff, having been duly sworn to tell the
5  truth, the whole truth, and nothing but the truth, was
6  examined and testified as follows:
7          EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8  BY MR. SHIELS:
9          Q.          Mr. Griffin, do you work for
   the State of Delaware?
10         A.          Yes, I do.
11         Q.          Would you explain where you
12 work and what you do?
13         A.          I work for the Secretary of
14 State, Division of Corporations and I'm a computer
15 programmer.
16         Q.          And how long have you held
17 that job?
18         A.          At Secretary of State?
19         Q.          Yes.
20         A.          Going on six years, I think.
21         Q.          So you apparently began that
22 job somewhere around 2001?

21

GRIFFIN-SHIELS

Ravis for something and he went back to Dan's cubicle and was talking about Jim and saying that Jim doesn't know his "F"ing job and Jim won't let me do my "F"ing job. That went on for about maybe five or ten minutes, but he wasn't complaining about Dan to Dan, he was complaining to Dan about Jim.

    Q.           And he didn't do it in Jim Ravis' presence?

    A.           No.

    Q.           Anything else that you can think of — well, let me say were there any other occasions where Mr. Fred acted in the same manner to male counterparts that he had acted towards Miss Duffy?

    A.           I don't recall any.

    MR. SHIELS:   I have no other questions.

---

22

GRIFFIN-NIEDZIELSKI

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. NIEDZIELSKI:

1
2
3    Q.           Do you recall him having a
4 problem with a contractor?
5    A.           Phil?
6    Q.           Yes.
7    A.           Have a problem with a
8 contractor?
9    Q.           Yes.  Chuck O'Brien?
10    A.           Yes.
11    Q.           And how did their — or how
12 was their relationship?
13    A.           They didn't talk to each
14 other either.
15    Q.           Were there times when Phil
16 would yell at him or treat him badly?
17    A.           No, I don't think he ever
18 said a word to him since I was there.
19    Q.           All right.  Now, you
20 indicated that you told Miss Duffy that you thought it
21 had something to do with gender?
22    A.           Yes, I did.

---

23

GRIFFIN-NIEDZIELSKI

    Q.           Why did you do that?

    A.           It was just a comment that I made that, you know, my observation, which could be right or wrong.

    Q.           Well, now, you said it n't your observation at all.  You said you think may have heard it from somebody else, Karen ins?

    MR. SHIELS:   No, that's not what he said.

R. NIEDZIELSKI:

    Q.           You never saw this, you r saw anything about Karen Adkins.  In other ls, you reported what Karen Adkins might have said u?

    A.           Yes, exactly.

    Q.           And you were then passing n to Miss Duffy?

    A.           Well, I think Miss Duffy may been there when Karen said that to tell you the

    Q.           But do you know anything

---

24

GRIFFIN-NIEDZIELSKI

1 about the facts of those, of Karen Adkins' promotion?
2    A.           No, no.  All the words she
3 told me was that she may have had to go to H.R.
4    Q.           All right.  But you're not
5 familiar with the circumstances at all?
6    A.           No, I'm not.  Not at all.
7    Q.           All right.  Now, how did you
8 get along with Phil Fred?
9    A.           Okay.
10    Q.           How does Pat Rogers get
11 along with Phil Fred?
12    A.           Okay.
13    Q.           Who is Phil Fred married to?
14    A.           Sandy Miller, used to be.
15    Q.           And where did she used to
16 work?
17    A.           Right in our general area.
18    Q.           How's he get along with her?
19    A.           Well, hopefully good.  He's
20 married to her.
21    Q.           Was Phil Fred the only
22 person that had difficulties in interacting with Miss

1

IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF DELAWARE

LORRAINE DUFFY,
an individual

        Plaintiff

        vs.                          C. A. No.
                                     06-460-SLR
DEPARTMENT OF STATE
an Agency of the State of
Delaware

        Defendant

- - - - - - - - - - - -

        Deposition of Gail Lanouette, taken before
Genevieve Ritter, a Notary Public and Registered
Professional Reporter, on October 16, 2007 at 2:00 p.m.
at 108 East Water Street, Dover, Delaware.

- - - - - - - - - - -

DELMARVA REPORTING
217-A North DuPont Boulevard
Smyrna, Delaware 19977
302-653-1036

delmarvavideo@mac.com

DELMARVA REPORTING
(302) 653-1036

Lanouette - Shiels

1  that, you know, they needed to have a discussion with

2  her about them.

3          Q.          Did you, as part of your

4  discussion with them, say that if she had met the same

5  standards, she should be promoted?

6          A.          Well, yeah.  That's, I mean,

7  if she meets all the promotional requirements, then

8  she should be promoted.  They didn't tell me whether

9  she did, she didn't.  I really don't know what

10 transpired.

11         Q.          In terms of whether her

12 promotion came immediately after that, you don't know?

13         A.          I do not recall.

14         Q.          Her line of report was

15 Mr. Syncock and then Mr. Ravis?

16         A.          That's correct.

17                     MR. SHIELS:  I have no other

18         questions.

19     EXAMINATION BY COUNSEL FOR THE DEFENDANT

20 BY MR. NIEDZIELSKI:

21         Q.          Does Mr. Reyes have the

22 authority to fire employees?

                    DELMARVA REPORTING
                     (302) 653-1036

**A000047**

Lanouette - Niedzielski

1      A.           Mr. Reyes?  Ultimate

2 authority for us to fire any employee is the Cabinet

3 Secretary.

4      Q.           Ultimate authority to fire?

5      A.           Cabinet Secretary does sign

6 off.

7      Q.           Promote?

8      A.           The Cabinet Secretary has

9 ultimate authority.

10      Q.           Demote?

11      A.           Cabinet Secretary has

12 ultimate authority.

13           MR. NIEDZIELSKI:  That's all

14      the questions I have.  We will read and

15      sign.

16      EXAMINATION BY COUNSEL FOR THE PLAINTIFF

17 BY MR. SHIELS:

18           Q.           Let me ask a question.  In

19 terms of the ultimate authority of the Cabinet

20 Secretary, does he or she, as the case may be, at any

21 point in time, normally rely on the intervening

22 supervisors who make recommendations?

DELMARVA REPORTING
(302) 653-1036

29

Lanouette - Shiels

A.          Our Cabinet Secretary relies on the, on management and HR, yes.

MR. SHIELS:  Thank you.  No other questions.

LAW OFFICES
OF
*Brown, Shiels, Beauregard & Chasanov*

ROY S. SHIELS
WILLIAM M. CHASANOV
HERMAN CUBBAGE BROWN, JR.
ANDRE M. BEAUREGARD

WILLIAM F. RICHARDSON
MARY E. SHERLOCK
BARRY W. MEEKINS
WALTER W. SPEAKMAN, JR.
GARY S. MELVIN

108 EAST WATER STREET
P.O. DRAWER F
DOVER, DELAWARE 19903
302-734-4766  734-4766
FAX NO. 302-674-0903
1-800-701-4766
cbrownbsbc@comcast.net

HERMAN C. BROWN
1925-1993

JACKSON R. DUNLAP, JR.
OF COUNSEL

GEORGETOWN OFFICE
10 EAST PINE STREET
P.O. BOX 742
302-856-7561

REHOBOTH BEACH OFFICE
401 REHOBOTH AVENUE
P.O. DRAWER B
302-226-2270

April 25, 2005

Mr. James Ravis, Manager
Delaware Department of State
1401 Federal Street, Townsend Building
Dover, Delaware 19901

Re: Grievance of Lorraine Duffy
    (Department of State)

Dear Mr. Ravis,

This letter is sent to you based on my understanding that Mr. Duffy is presently reporting directly to you. The purpose of the letter is to initiate a grievance pursuant to Merit Rule 18.6. The grievance is based on hostile environment and retaliation in contravention of Merit Rule 2.1, and conduct not based on merit reasons interfering with grievant's ability to do her job. More specifically the behavior of Mr. Carroll, her supervisor, in screaming at, and actually threatening Ms. Duffy in a way male subordinate and younger subordinates are not treated. Indeed, the verbal threats are unlawful. Nor is it proper to remedy this mistreatment by punishing Ms. Duffy, by transfer or otherwise. Further, the actions and words of a co-worker (Mr. Phil Fred) create or contribute to the hostile environment. Complaints are not acted upon and his actions remain hostile.

Since this office will be representing Ms. Duffy in this grievance I ask that we be advised of any scheduling of the grievance sufficiently far in advance to permit us to prepare and attend. Thanking you in advance for your cooperation in this matter, I am
Very truly yours,
BROWN, SHIELS, BEAUREGARD & CHASANOV

ROY S. SHIELS

RSS\bs
cc: Ms. Lorraine Duffy
    Ms. Gail Lanouette, Human Relations

4/27 spoke to Roy

D00126

A000050

#22

STEP 3 GRIEVANCE DECISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In the Matter of:
LORRAINE DUFFY
("GRIEVANT")

and

STATE OF DELAWARE
DEPARTMENT OF STATE
("DOS" OR "DEPARTMENT")

05-00113DOS-ST3

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| Hearing: | August 11, 2005 |
| Before: | Catherine T. Hickey |

Appearances:

For the Grievant:
Roy Shiels, Esq.
Lorraine Duffy
Michelle Duffy

For the Department
Al Carter
Gail Lanouette
James Ravis

D00169

Duffy
Page 2

*Nature of the Dispute*

Grievant filed a complaint with her Department, contending that she was being subjected to a hostile work environment. The Department agreed and took what it deemed to be appropriate disciplinary action against the offender. Subsequently, Grievant was re-assigned from UNIX, or server based, programming work to mainframe programming work. Grievant alleges that this transfer was retaliatory discrimination and based on non-merit factors in violation of Merit Rule 2.1.[1] Grievant seeks remediation of her hostile work environment without penalty to her, and a return to UNIX programming.

*Positions of the Parties*

Grievant

When she came to DOS approximately three and one-half years ago, Grievant was hired as a back up UNIX programmer. Prior to working at DOS, Grievant had worked at DTI. She took the job at DOS because it was a new platform and different technology than what she was involved with at DTI. Grievant saw the position with DOS as advancing her career. Since she has been with DOS, there have been four programmers, including herself, who are State employees. Those four programmers have been grouped into pairs, with two of them working in the mainframe area and two working in UNIX. Until now, she has always been one of the UNIX pair.

The State is working on a new project to replace the computer system that exists now. The current system is partly UNIX and partly mainframe. The new system will be a single system and will be a server based system, possibly UNIX. This new project is still in the planning stages and has not yet even gotten off the ground. There is no justification to give her mainframe tasks at this point. Although she has experience with and skills for mainframe work, she is not familiar with CIS/COBALT, which is needed for the mainframe online work. Her title is Programmer Specialist, but that is a generic classification title, not a working title. There is more than one form of programming, and the UNIX and mainframe skills are distinct and separate.

---

[1] At the hearing in this matter, the Department suggested that this grievance addressed Merit Rules 2.1 and 18.6. However, Merit Rule 18.6 sets out the procedure and scope of Step 1 of the Grievance Procedure. Since there was no allegation that the grievance had been improperly processed at that level, this decision is limited to Merit Rule 2.1.

D00170

Duffy
Page 3

She has been the target of harassing conduct which created a hostile work environment for her since approximately February 2002. The primary harasser has been her co-worker and fellow UNIX programmer, Phil Fred. More recently, her previous immediate supervisor, Dan Carroll, has also engaged in hostile and harassing behavior. In 2002, Fred's inappropriate conduct was sufficiently severe that she was approached by James Ravis, the Department's Information Systems Manager, who asked why she allowed Fred to abuse her. Initially, she thought she could resolve the situation herself. When she quickly learned that she would not be able to manage the offensive behavior on her own, she sought assistance and advice from her supervisors and Human Resources staff. In addition, Carroll observed the inappropriate conduct on a daily basis and he should have been addressing the problem even in the absence of complaints she raised. She has met with Ravis, and with Ravis and Carroll, about the problems on many occasions since 2002. In May of 2003, she met with staff from Human Resources to discuss her concerns about Fred's interaction with her. Within a day or two of that conversation, she was told that she was going to be moved to mainframe work. Grievant objected to that action and the decision was rescinded.

In April 2005, Grievant was harassed and physically threatened by Carroll. She complained about that conduct and, after reviewing the matter, disciplinary action was taken against Carroll. At that time, Grievant was assigned to another supervisor. In addition, Grievant was told that she was being moved from the UNIX work to mainframe work. At Grievant's request, she was provided time to complete a long-term project she had been working on for several months. Grievant was able to substantially complete this project, but error correction still remains to be done. She has been told by her current supervisor, Ravis, not to do anything further on this project. Although she objected to the re-assignment to the different platform, the plans proceeded and a new Performance Plan was established as of August 10, 2005.

<u>Department</u>

The new computer system that DOS is working on will impact how the Division of Corporations does business. Since that Division brings in approximately $600 million of revenue per year into the State, this new system is an important project for the Department. Currently, the project is with a State vendor where the Request for Proposal (RFP) is being completed. DOS expects to get the finalized RFP by mid-November. Thereafter, the project will go out for bid. DOS anticipates once there is an award, there will be a development period of one to one and one-half years. Therefore, at best, the new system will not be operational until mid-2007.

D00171

Duffy
Page 4

The State anticipates that the new computer system will be a server-based system, like the current UNIX system. The specifics of the new system will be developed by the entity who is awarded the project based on the RFP bidding process. In her new assignment, Grievant is being asked to put data into a format that will make it easier to migrate it onto the new system when it is operational.

As the Information Systems Manager, it has always been Ravis' intention to expose all the DOS programmers to all the environments. In keeping with this objective, in addition to Grievant being reassigned to mainframe work, one of the mainframe programmers has been reassigned to UNIX work. It is within a programmer's classification to go between platforms, so Grievant is not working outside of her classification. When the replacement with the new system is completed, he will have one group of programmers; this will provide a single solution to support the business needs of the Division of Corporations. He does not intend to reassign Fred to work on mainframe projects. Fred has written programs that utilize mainframe applications, so he already has some exposure to that platform.

The Department has to ensure a safe work environment for its employees, including Grievant. Grievant indicated on many occasions she thought she was in a hostile work environment, but did not want to move. It did not make sense to leave Grievant working in the same environment she claimed was creating a hostile work environment. Carroll and Fred were the individuals Grievant identified as creating the hostile environment. Re-assigning Grievant to a different supervisor and to mainframe work with a different co-worker eliminates the contact that created the hostile environment. Grievant has not been physically moved. All the programmers at DOS are in one large room and Grievant's work station remains the same as it always has been. Grievant also has been offered the opportunity to physically move across the hall to a room where one of the outside contractor programmers works.

Grievant, through her attorney, presented her requested three part remedy in a letter dated May 23, 2005. The Department took action on those requests and now it appears that the grievance is being extended to also include that Grievant only be assigned to work on UNIX programming.

*Discussion*

Although the Department may have been well-intention in its actions, the evidence and testimony presented at the hearing established that it re-assigned Grievant from the UNIX platform to the mainframe platform as a result of her complaining about the inappropriate

D00172

Duffy
Page 5

treatment that she received from both her supervisor and her co-worker. Moving
Grievant in response to her raising concerns had been proposed on one other occasion.
When Grievant objected to that action as the solution to the matter, the decision was
reversed. This time, however, perhaps because the inappropriate behavior had spread to
Grievant's supervisor, the Department determined that, in its judgment, it would be in
Grievant's best interest to have her begin working in mainframe, "her primary area of
expertise." (May 2, 2005 letter from Ravis to Shiels)

The Department offered several explanations for its decision. It noted that it is within a
manager's prerogative to assign work as deemed necessary. However, this reassignment
was considered only after Grievant made what were found to be valid complaints about
her treatment by her supervisor and co-worker. DOS also noted its desire to expose all its
programmers to all environments. However, the Department described mainframe as
Grievant's *primary* area of expertise and reported that there is no intention to re-assign
the other UNIX programmer, Fred, to mainframe, because he has already had *some*
exposure to that platform. In addition, the Department anticipates that the platform of the
new system will be a UNIX type one, making exposure to and experience with that type
of platform apparently more valuable to the Department's future computer operations.
Thus, this proffered rational is neither reasonable nor persuasive. Finally, the
Department explained its responsibility to provide a safe working environment for
Grievant, one that is free of hostility and threats. However, it is not the *fact of this
responsibility but the manner of how it is addressed* which is at issue in this case. When
taking action to protect an employee who has complained of a hostile environment, the
focus should be on the perpetrator(s) and not the recipient of the hostility, even when the
offender is, as the Department acknowledged in this case, a technologically valuable
employee. Many courts which have addressed the issue have found that the transfer or
reassignment of a complaining employee is impermissible and constitutes retaliation.

The Grievant has maintained throughout the processing of her complaint, including in the
May 23, 2005 letter from her attorney, that she did not wish any resolution of her valid
complaints to include transfer or reassignment to work with mainframe applications.
She was worried that her desire to work in a hostile-free environment would result in the
removal of the UNIX work that she enjoyed and that had initially attracted her to the
position. Although the Department acted in what it thought was her best interest, that
determination was made without input from Grievant and is contrary to its obligation to
address her valid complaints without violating Merit Rule 2.1.

D00173

Duffy
Page 6

*Decision*

For all of the foregoing reasons, the grievance is sustained.   The Department is to return
Grievant to UNIX programming work and seek means of eliminating the hostile work
environment that are not contrary to Merit Rule 2.1

Catherine T. Hickey
August 15, 2005

D 0 0 1 7 4

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

LORRAINE DUFFY,                    :
                                   :
    Plaintiff,             :
                                   :
    v.                     :        C.A. No. 06-460-SLR
                                   :
DEPARTMENT OF STATE, an  :
Agency of the State of Delaware,  :
                                   :
    Defendant.             :

## CERTIFICATE OF SERVICE

The undersigned certifies that on the date indicated he electronically served a copy

of the attached document on the following:


Roy S. Shiels, Esquire
P.O. Drawer F
108 E. Water Street
Dover, DE  19903
rshielsbsbc@comcast.net



/s/ Marc P. Niedzielski
Marc P. Niedzielski (# 2616)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)  577-8324
marc.niedzielski@state.de.us


DATED: July 31, 2008