IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LORRAINE DUFFY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-460-SLR |
| | ) |
| DEPARTMENT OF STATE, an agency | ) |
| of the State of Delaware, | ) |
| | ) |
| Defendant. | ) |

Roy S. Shiels, Esquire of Brown, Shiels & O'Brien, LLC, Dover, Delaware.  Counsel for Plaintiff.

Marc P. Niedzielski, Esquire, Deputy Attorney General, State of Delaware Department of Justice, Wilmington, Delaware.  Counsel for Defendant.

**MEMORANDUM OPINION**

Dated:  February 25, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Lorraine Duffy ("plaintiff") filed a complaint against defendant
Department of State, an agency of the State of Delaware ("defendant" or "DOS") on
July 28, 2006, alleging a hostile work environment based upon gender and unlawful
retaliation in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000(e), et
seq.) (hereinafter, "Title VII"). (D.I. 1)  The discovery period in this case is closed. (D.I.
8, 26)  Presently before the court is defendant's motion for summary judgment. (D.I.
30)  The court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §
2000e-5(f)(3).  For the reasons that follow, the court grants in part and denies in part
defendant's motion.

## II. BACKGROUND

Plaintiff began employment as a computer programmer with defendant on
February 25, 2002.  She had previously done similar work for the Office of Information
Services ("OIS"), another State agency which has since reorganized into the Division of
Technology and Information ("DTI").  While with defendant, plaintiff worked with three
other employees – one female (Particia Rogers ("Rogers")) and two males (Phil Fred
("Fred") and Edward Griffin ("Griffin")) – who reported to the same first-level supervisor,
Dan Carroll ("Carroll").  Plaintiff's second-level supervisor was James Ravis ("Ravis").
Plaintiff's original assignment was to be the back-up for (and be trained by) Fred on
defendant's UNIX operating system.  Plaintiff previously worked with Fred and the two
worked well together.  (D.I. 32 at A37-38, A40)

Starting in July 2002, plaintiff was ill and out of work for a period of several

months. Upon her return, Fred was rude to her.[1] In plaintiff's words, Fred "was very short with, and critical of, any and all of [her] work," "frequently used profanity (the 'f' word) and obscene gestures (masturbation)" and was "uncooperative and evasive about work issues." (*Id.* at A3) Plaintiff asserts that Fred also brought other (unnamed) female (non-programmer) employees to tears, and recalls one technical support employee, April Wright ("Wright"), in tears leaving Fred's office on an undated occasion. (*Id.* at A3-A4) Plaintiff states that Fred was "particularly nasty" to her, kicked the back of her chair, walked away during conversations, and loudly interrupted her interaction with other co-workers. (*Id.* at A4)

In 2003, plaintiff's relationship with Carroll was strained. Plaintiff had a meeting with Fred in Ravis's office in January 2003 during which she told Fred his treatment of her was due to her gender, wrong, and had to stop, but it did not. (*Id.* at A4) Plaintiff memorialized the meeting in an email dated January 27, 2003 but did not send it. (*Id.*) About this time Rogers was hired to work on the mainframe. (*Id.*) Plaintiff states that Carroll, in conversation with a male co-worker, referred to Rogers and plaintiff as "DTI rejects." (*Id.* at A5)

Plaintiff had other meetings to discuss her work environment, including one with Carroll in which he yelled at plaintiff and raised his fists in front of Ravis. (*Id.* at A5) Fred stopped talking to plaintiff and Carroll's attitude towards plaintiff became "increasingly negative." (*Id.*) According to plaintiff, Griffin and Rogers commented to

---

[1]Unless otherwise noted, the following facts are taken from plaintiff's answers to defendant's interrogatories, as laid out in plaintiff's opposition brief; defendant does not specifically contest these facts in its reply brief.

2

her that they believed the behavior exhibited towards her was gender-related, and that Fred and Carroll did not act similarly with male co-workers. (*Id.*) In late 2003 or early 2004 plaintiff received her only performance evaluation from DOS, which indicated that she "meets expectations." (*Id.*) Plaintiff claims the stress of her workplace made her physically ill, and she sought assistance from the State's Employee Assistance Program ("EAP") in late 2004. (*Id.* at A6)

In July 2004, Carroll announced that plaintiff and Griffin would be switching duties. Plaintiff states that she sent an email to Gail Lanouette ("Lanouette"), the DOS personnel director, indicating her objection to the change and that she felt she was being punished for her complaints about the workplace hostility exhibited by Fred and Carroll. (*Id.*) Carroll's decision was reversed. (*Id.*) Plaintiff states that Lanouette indicated that she would facilitate bringing about changes in Fred's behavior over time, and that plaintiff should interface with Carroll instead of Fred. (*Id.*)

On August 9, 2004, Fred indicated training would be held, and Lanouette scheduled a meeting for September. (*Id.*) Plaintiff spoke to Carroll about working together with Fred and Carroll, at which time Carroll told plaintiff that Fred indicated that plaintiff had refused training, a fact which plaintiff disputes. (*Id.* at A7) "Carroll was loud and clearly upset and berated plaintiff for wanting her own way, saying the three would meet that afternoon." (*Id.*) Ravis heard this commotion and met with Carroll, and the two decided someone from personnel should attend the meeting. (*Id.*) Plaintiff suggested to Carroll that she, Carroll and Fred attempt to meet first and again was "loudly berated" by Carroll. (*Id.*)

3

Plaintiff met with Ravis on August 11, 2004 and indicated to Ravis that she was "uncomfortable and fearful" in dealing with Carroll. (*Id.*) Plaintiff states that Ravis told her she should deal with Carroll and be deferent to his decisions. (*Id.*) Plaintiff met with Carroll on September 1, 2004 regarding training, and Carroll indicated that "he and Ravis disagreed about training because Ravis wanted Fred to train plaintiff and Carroll felt Fred would never train plaintiff." (*Id.*) Carroll announced there would be bi-weekly meetings of the programming staff beginning September 6, 2004 and all programmers would write up assignments and time sheets. (*Id.*) Fred subsequently went on vacation, during which time Carroll corrected problems arising from Fred's work "without addressing the causation of problems as desired by plaintiff," creating additional strain between plaintiff and Carroll. (*Id.*)

Carroll and Lanouette met with plaintiff in October 2004, at which time "[t]here had been no recent outbursts from Carroll" and "Carroll indicated plaintiff was doing a good job." (*Id.*) Plaintiff told Carroll and Lanouette that Fred would not train her and that she would try to learn on the job instead, and Lanouette said this was a good idea. (*Id.* at A8) Plaintiff claims that male programmers received training not afforded her. (*Id.*) There had been no programmer meetings to plaintiff's knowledge by December 2004. Her attempts to talk to Fred got "surly or nasty responses" so plaintiff continued to go to Carroll as a go-between, despite that Carroll "was again becoming increasingly short and negative with plaintiff" and "yelled at her again." (*Id.*) Plaintiff later discovered that programmer meetings were held but she was not notified or invited. (*Id.*)

4

In January 2005, plaintiff began seeing a counselor provided by the EAP, who suggested a psychiatrist and scheduled a meeting with one in February. (*Id.*) Plaintiff attempted to raise a work issue with Carroll who "again yelled at her and berated her." (*Id.*) She claims she emailed Ravis about a meeting, and Ravis met with plaintiff and Carroll in mid-January. At the meeting, plaintiff stated that she could no longer tolerate the manner in which she was being treated and Ravis indicated that Carroll should not yell at plaintiff. Plaintiff asserts that Ravis shared with her a series of emails between Ravis, Carroll, plaintiff and Fred "about the lack of communication" between those parties. (*Id.* at A9)

Plaintiff and Carroll met on January 21, 2005, at which point Carroll indicated that DOS would return to a training arrangement involving Fred and plaintiff. (*Id.*) Carroll "criticized plaintiff's work with a 'reject letter' (*i.e.* system problem)." (*Id.*) Later that day plaintiff, Carroll and Fred met in Carroll's office regarding training. Carroll criticized plaintiff regarding her lack of knowledge and understanding of UNIX scripts, and stated that plaintiff should be more understanding of Fred's dislike for training. (*Id.*) Plaintiff asserts that she was never trained on UNIX scripts. (*Id.*) Plaintiff found the meeting stressful. Plaintiff states that Carroll asked her if she was all right, and said that he related to Fred better than plaintiff. (*Id.*)

On March 31, 2005, Carroll questioned why plaintiff was running a test on a "merge"[2] program, saying it should be cancelled. (*Id.* at A10) Carroll became furious,

---

[2]Plaintiff states that the program merges current images (using defendant's new imagery system) with archived images for "Corporation, UCC, and Franchise Tax applications." (D.I. 32 at A10)

5

pounded on the desk, and rose to his feet. (*Id.*) Plaintiff was frightened; she told
Carroll he needed to do something about his anger, and walked away. (*Id.*)

An incident occurred on April 13, 2005 regarding plaintiff's testing of the "merge"
program. Unexpected results were occurring following changes to the program made at
the suggestion of Fred and Carroll. (*Id.*) Carroll instructed plaintiff to run the program
again and went to the computer room. Carroll then stormed back and claimed plaintiff
had run the testing while administrators were clearing data from earlier tests. (*Id.*)
Plaintiff told him that the last test run was finished and that she had not done anything.
Carroll told plaintiff to key a command into her computer. Plaintiff did not key the
command, and instead tried to demonstrate to Carroll that the last test run had been
completed. (*Id.*) Carroll "yelled at her and said he was going to slap her." (*Id.*) Plaintiff
keyed the command and Carroll walked away. (*Id.*) Plaintiff asked Fred to confirm that
the last test was concluded, and Fred told plaintiff to check whether it was running. (*Id.*)
Carroll yelled at plaintiff again, claiming she was not following instructions from Fred.
(*Id.*) Fred suggested to Carroll that they should leave. Plaintiff told Ravis about the
incident, and Ravis spoke with Lanouette and met with Carroll. (*Id.*) Ravis directed
plaintiff to have no further contact with Carroll. (*Id.*) Ravis met with Griffin the following
day to recount events. (*Id.*)

Plaintiff called Ravis at home on Sunday, April 17, 2005 and told him that she did
not want to go to work Monday in view of the incident. (*Id.* at A11) Ravis informed
plaintiff that Carroll would receive a written reprimand, and asked plaintiff to document
what had occurred and to document the workings of the "merge" program so it could be

reassigned. (*Id.*) Defendant does not deny this incident but states, in its interrogatory responses, that the incident spawned a meeting between Lanouette and Ravis, and that Ravis issued Carroll a written reprimand. (D.I. 31 at 8; D.I. 32 at A29)

On Monday, Ravis indicated that he and personnel decided to assign plaintiff to different work. (D.I. 31 at A11) Plaintiff called Lanouette and asked if it was safe to work; Lanouette told plaintiff she would not meet with plaintiff without Ravis present but that it was safe. (*Id.*) On April 20, 2005, Ravis, plaintiff, Lanouette and another personnel employee had a meeting and plaintiff "reiterated her belief that the change was unfair and punished her for reporting discrimination and retaliation[.]" (*Id.* at A11-12) Ravis appeared upset with plaintiff. Lanouette asked plaintiff what she wanted; plaintiff responded that she wanted to remain on her project and maintain her present duties and have Fred interact with her professionally. (*Id.* at A12)

Ravis had discussions with Carroll and then Fred, and decided to give plaintiff's program to Fred to test, which upset plaintiff. (*Id.*) Plaintiff asserts that Ravis in turn became upset with plaintiff and "asked her if she had ever thought of leaving DOS." (*Id.*) Following another personnel meaning, it was decided that Fred would not review plaintiff's work. (*Id.*) Plaintiff states that the next day, she tested her program and found Carroll had deleted her "testing output." (*Id.*)

A letter from plaintiff's counsel to Ravis appears of record, dated April 25, 2005. (*Id.* at A50) "The purpose of the letter [was] to initiate a grievance pursuant to Merit Rule 18.6." (*Id.*) The grievance was based upon a hostile work environment and retaliation in contravention of Merit Rule 2.1, as follows: (1) Carroll screamed at and

7

threatened plaintiff in a manner different from how male subordinates are treated; (2) it
is not proper "to remedy this mistreatment by punishing Ms. Duffy, by transfer or
otherwise"; (3) Fred's actions "create or contribute to the hostile environment"; and (4)
complaints are not acted upon and Fred's actions remain hostile. (*Id.*)

Plaintiff's problems continued in May 2005. (*Id.*) Fred did not review plaintiff's
test results and told plaintiff to leave his office after plaintiff and Fred had a
disagreement about the source of a hardware problem. (*Id.*) Fred told plaintiff he
would not work with her, as directed. (*Id.*) On May 13, 2005, Ravis told plaintiff she
could finish the "Corporations" aspect of her "merge" program, but her project would
then be given to someone else to complete. (*Id.*) Plaintiff was to "begin work on main
frame batch views as soon as possible." (*Id.*) Plaintiff states that she wrote to
Lanouette concerning the perceived abuse from Fred and Carroll and disparate
treatment due to plaintiff's gender. (*Id.*)

On June 8, 2005, plaintiff filed a charge of discrimination with the Equal
Opportunity Commission (the "EEOC")[3] alleging a hostile work environment based on
gender, age, and retaliation. (*Id.* at A1, A12) The "brief statement of allegations"
contained therein stated the following:

> Charging party has been subjected to a hostile work environment based on her
> gender and age by Dan Carroll (male, 49), Jim Ravis (male, 59), and Philip Fred
> (male, 52). On one occasion Mr. Ravis commented "Lorraine can be a hard-
> headed woman." After Pat Rogers (female, 47) was hired from the same state
> agency as Charging Party, Mr. Carroll commented that "We are getting all of
> DTI's rejects," referring to Pat and I who were the only female employees in the
> section. Charging Party was asked how she got the job by Dan. Philip Fred and

[3]An agency of the United States of America charged with the administration,
interpretation, and enforcement of Title VII.

8

> Dan Carroll are extremely abrasive and demeaning. Mr. Fred had to be
> instructed to stop utilizing a specific sexual gesture. He was assigned as my
> trainer but has not provided any training. Charging Party believes she is being
> retaliated against for reporting his actions. Charging Party was told that she was
> unable to be Mr. Fred's back up.

(*Id.* at A1) Plaintiff also alleged that her duties had been changed following her

grievance. (*Id.*) Plaintiff thereafter received a right to sue letter.[4] (D.I. 1 at ¶ 33; D.I. 32

at A13) The complaint at bar, filed July 28, 2006, alleges a hostile work environment

and retaliation based upon gender, and no other grounds. (D.I. 1)

Following a hearing, plaintiff received a favorable decision on her Merit Rule 18.6

grievance from the State Merit System on August 15, 2005. (D.I. 32 at A13, A51-61)

During those proceedings, plaintiff stated that she was "reassigned from UNIX, or

server based, programming work to mainframe programming work." (*Id.* at A52) The

DOS took the position that it is within a programmer's classification to go between

platforms, and moved plaintiff in an attempt to eliminate the contact that created the

hostile environment. (*Id.* at 54) The State's decision stated that, "[a]lthough the

Department may have been well-intention [sic] in its actions, the evidence and

testimony presented at the hearing established that it re-assigned [plaintiff] from the

UNIX platform to the mainframe platform as a result of her complaining about the

inappropriate treatment from both her supervisor and her co-worker." (*Id.* at A55)

Because the DOS was moving to a UNIX-type platform for future applications,

relocating plaintiff to the mainframe was in neither party's best interest. (*Id.*) The DOS

was found to have inappropriately focused on the recipient of the hostility rather than

---

[4]This letter does not appear to be of record.

9

the perpetrator(s) and acted without plaintiff's input in violation of Merit Rule 2.1. (*Id.*) The DOS was instructed to "return [plaintiff] to UNIX programming work and seek means of eliminating the hostile work environment." (*Id.* at A56)

Following these events, plaintiff was prohibited from dealing with Carroll or Fred and was to deal exclusively with Ravis. (*Id.* at A13) She was given a "Performance Plan" which she claims was different from male programmers. (*Id.*) According to plaintiff, Ravis indicated that he would end plaintiff's isolation from Fred and Carroll in February of 2006, but at that time decided not to change the arrangement. (*Id.*) Plaintiff did not attend programmer meetings; Ravis indicated she would have to sign a waiver to attend, and there is no indication that this occurred. (*Id.* at A13-14)

Plaintiff's last day was February 8, 2006. At this time she began receiving short term disability benefits for workplace stress. (*Id.* at A14) She has since been awarded long term disability benefits and has applied for Social Security benefits. (*Id.*) Plaintiff has sought assistance through counseling and a psychiatrist, who believe she cannot work due to stress arising from the environment at DOS. (*Id.*)

## III. STANDARD

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that

10

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. DISCUSSION

### A. Hostile Work Environment

The Third Circuit has articulated five factors that must be proven in order to establish the existence of an actionable hostile work environment under Title VII: (1) plaintiff suffered intentional discrimination because of her gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same gender in that position; and (5) the existence of respondeat superior liability. *See Clayton v. Pennsylvania Dept. of Welfare*, Civ. No. 07-3171, 2008 WL 5396290, *3 (3d Cir. 2008) (unpublished) (citing *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)). In determining whether the conduct at issue is sufficiently extreme, the totality of the circumstances must be considered. *See Caver v. City of Trenton*, 420 F,3d 243, 262 (3d Cir. 2005). That is, the "overall scenario" must be examined. *Id.* (citation omitted). This helps to ensure that more "subtle forms" of discrimination do not go undetected. *See Cardenas v. Massey*, 269 F.3d 251, 261-62 (3d Cir. 2001).

Viewing all facts and reasonable inferences in a light most favorable to plaintiff, the court finds that plaintiff has failed to produce enough evidence beyond her allegations and her deposition testimony that creates a sufficient issue of material fact which a jury must resolve. Plaintiff has had the full benefit of discovery and the court cannot allow plaintiff to rely, at this late stage, only on "uncorroborated generalities." *See Williams v. City of Chicago*, 325 F. Supp. 2d 867, 879 (N.D. Ill. 2004). *See also Longmire v. Wyser-Pratte*, Civ. No. 2007 WL 2584662, *11 (S.D.N.Y. Sept. 6, 2007)

12

(granting summary judgment on hostile work environment claim against plaintiff, who "relie[d] exclusively on his own conclusory allegations – which [were] wholly and uniformly uncorroborated"); *Shamban v. Aetna*, 262 F. Supp. 2d 531, 536 (E.D. Pa. 2003) (holding that plaintiff failed to produce enough evidence beyond her deposition testimony to create a sufficient issue of fact to be resolved by a jury), *aff'd*, 115 Fed. Appx. 578 (3d Cir. 2004) (non-precedential).

Even taking plaintiff's story on its face, as the court must for purposes of the motion at bar, plaintiff's claims do not pass scrutiny. Plaintiff does not claim that Fred or Carroll made any comments, insults, jokes or other negative statements relating to plaintiff's gender. As reflected in the EEOC charge of discrimination, plaintiff states that Carroll, speaking with an unnamed male co-worker, referred to Rogers and plaintiff as "DTI rejects." (*Id.* at A5) It is unclear whether plaintiff claims to have heard this comment firsthand. On its face, the comment is not indicative of gender-based animus. Plaintiff states that Carroll directed the comment at plaintiff and Rogers, who were the only female employees, but were also apparently the only employees hired from DTI. There is no testimony by Rogers regarding the incident and there is little, if any, evidence of record regarding Rogers' attitude and performance. The record does reflect that plaintiff had some issues with receiving direction.[5] Gender is one of many

---

[5]Carroll yelled at plaintiff and pounded the desk on March 31, 2005 during the "merge" program testing after plaintiff (admittedly) challenged Carroll's suggestion to cancel her program. The "slap" threat occurred on April 13, 2005, again following plaintiff's challenge of Carroll's direction.

13

plausible undertones of the "DTI rejects" comment.[6]   However, "the mere utterance of

an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently

affect the conditions of employment to implicate Title VII liability."   *Weston v.*

*Commonwealth of Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001) (citation omitted).

Aside from this comment, the only other evidence relating to gender is plaintiff's

general assertion that male programmers were treated better by Fred and Carroll, and

that Griffin and Rogers commented to her that they believed the behavior exhibited

towards her was gender-related because Fred and Carroll did not act similarly with male

co-workers.   Plaintiff relies solely on her (self-serving) interrogatory answers for support

of these claims; there is no corroborating testimony of record.[7]

With respect to Fred, plaintiff asserts that he was "surly" and "nasty" when not

ignoring her, he kicked her chair and would treat her rudely in front of other workers,

and he used profanity and an obscene gesture while dealing with her and did not

behave similarly with male programmers.   She does not assert that Fred behaved in

this manner with Rogers.   In contrast, Griffin testified that Fred got along with Rogers.

---

[6]The court notes that defendant does not point to any testimony by Carroll
explaining his motivation in making the comment.

[7]In addition to the lack of corroborating testimony by any witnesses, the court
notes that plaintiff has identified several pieces of documentary evidence in her
interrogatory answers which were either not discovered or not filed as exhibits to
plaintiff's papers: (1) plaintiff's draft email dated January 27, 2003 memorializing her
meeting with Ravis and Fred of that date; (2) emails of "late July, 2004" indicating that
the hostile work environment had "continued to worsen"; (3) plaintiff's request for a
meeting with Ravis in January 18, 2005, presumably documenting some reason for her
request; (4) emails shared with plaintiff by Ravis (between Ravis, Fred and Carroll) on
January 18, 2005; (5) the "reject letter" from Carroll criticizing plaintiff's work on January
21, 2005; and (6) any documentation prepared by plaintiff in response to Ravis's April
2005 request for her to document the incident of April 13, 2005.

(*Id.* at A45) There is no indication of record that Fred's attitude towards plaintiff was the result of her gender as compared to any other reason.

Plaintiff claims that she witnessed Wright crying after leaving Fred's office, but provides no further details. There is no corroborating testimony by Wright; in fact, Wright testified that she got along well with Fred. (*Id.* at A43)

The only other comment specifically recounted by plaintiff on the record was Carroll's statement that he was going to "slap" plaintiff. Though this conduct is far from condonable, again, there is no indication that Carroll's animus was directed at plaintiff on the basis of her gender. Plaintiff admits that, prior to the "slap" threat, Carroll had asked her to do something (key a command into the computer) and she did not do it; instead, plaintiff was attempting to persuade Carroll that she had not made an error. (*Id.* at A10) Even if Carroll's action did not result from a perceived insubordination, there is no evidence that the "slap" threat was made because plaintiff is female. Similary, Carroll's comment that he "related to Fred better than plaintiff" does not indicate a gender, rather than personal, bias.

"Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions' of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Although Fred and Carroll's behavior was far from ideal, Title VII "does not set forth a general civility code for the American workplace," *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2412-12 (2006), nor is it "designed to purge the workplace of vulgarity," *Baskerville v. Cullican Int'l*, 50 F.3d 428, 430 (7th Cir. 1995).

15

The court finds that plaintiff has not demonstrated that a jury question exists with respect to her hostile work environment claim. Through her own unsupported interrogatory responses, plaintiff has painted a picture of several incidents spanning 2003 to 2006 – none of which relate specifically to gender. The court finds that the incidents as described are not "extremely serious" (*i.e.*, the conduct complained of is not "severe" for purposes of Title VII). *See Ahmed v. Lowe's Co. Inc.*, Civ. No. 06-4798, 2008 WL 2967061, \*7-8 (E.D. Pa. July 31, 2008) (granting summary judgment on plaintiff's hostile work environment claim where plaintiff relied on his own deposition testimony in support of his claim and "[n]owhere [did] plaintiff claim that [his supervisor] or any of his co-workers used racially insensitive language or threatened him because of his race."); *Harris v. Franklin-Williamson Human Services, Inc.*, 97 F. Supp. 2d 892, 903 (S.D. Ill. 2000) (plaintiff's uncorroborated testimony describing conduct of superior, including telling "a joke while similuting masturbation," did not create a triable issue on her hostile work environment claim).

In addition, the court notes that it not find the complained-of conduct to be "pervasive" on this record. Plaintiff generally avers that her relationship with Carroll was strained in 2003 (during which Carroll yelled at her and raised his fists) and in 2004 (when plaintiff was temporarily reassigned duties). There is no indication that these events were proximate. No particular dates are provided prior to August 2004. (D.I. 32 at A6) Plaintiff was "loudly berated" on August 9, 2004 by Carroll, but no comparable incidents occurred through October 2004, at which point plaintiff admits "[t]here had been no recent outbursts from Carroll" and "Carroll indicated [she] was doing a good job" during a review. (*Id.* at A7) Plaintiff generally received "surly" or "nasty" responses

16

from Fred during this time, of an undisclosed nature, and Fred yelled at plaintiff in December 2004. (*Id.* at A8) Sometime prior to January 18, 2005, plaintiff states that Carroll "yelled at her and berated her" over a work issue, with no further detail. (*Id.*) Carroll yelled at plaintiff and pounded the desk on March 31, 2005 during the "merge" program testing after plaintiff (admittedly) challenged Carroll's suggestion to cancel her program. (*Id.*) The "slap" threat occurred on April 13, 2005, again following plaintiff's challenge of Carroll's direction. (*Id.*)

These facts suggest that there were other reasons, besides gender, underlying Fred's and Carroll's negative responses to plaintiff. Notwithstanding, plaintiff has described several discrete incidents scattered over two years' time. The court does not find the foregoing to be evidence of "pervasive" hostility.[8] *See Rozskowiak v. Village of Arlington Heights*, Civ. No. 01-5414, 2004 WL 816432, *5 (N.D. Ill. Mar. 26, 2004) (granting summary judgment for defendant where "[a]t most, plaintiff's uncorroborated evidence would show that he was subjected to offhand, offensive remarks . . . over a period of time not exceeding three months"). Put another way, plaintiff has not raised a genuine issue of material fact that her workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the

---

[8]Plaintiff's claim that Fred consistently was rude to her (minus specifics of statements made to plaintiff) and, at other times, avoided plaintiff, does not evidence a hostile work environment. *See Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993) (The "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.") (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Plaintiff's allegation that Fred failed to train her on UNIX during that time ultimately goes to the third prong of the prima facie case, or whether plaintiff was "detrimentally affected." The court does not reach this prong.

17

conditions of the victim's employment and create an abusive working environment."
*Harris,* 510 U.S. at 21 (citing *Meritor Savings Bank,* 477 U.S. at 65, 67).

## B. Retaliation

"To establish a prima facie case of retaliation under Title VII, a plaintiff must
show that (1) she engaged in a protected activity under Title VII; (2) the employer took
an adverse action against her; and (3) there was a causal connection between the
employee's participation in the protected activity and the adverse employment action."
*Wilkerson v. New Media Technology Charter School Inc.,* 522 F.3d 315, 320 (3d Cir.
2008) (citing *Moore v. City of Philadelphia,* 461 F.3d 331, 340-41 (3d Cir. 2006)).

Plaintiff initiated her Merit Rule 18.6 grievance on April 25, 2005. Plaintiff's June
8, 2005 charge of discrimination with the EEOC stated that, since her grievance,
plaintiff's assignments had been changed and she was given "demeaning projects" and
asked by Ravis if she had thought of leaving DOS. (D.I. 32 at A1) Defendant asserts
that plaintiff's State Merit System grievance does not constitute "protected activity" for
purposes of Title VII, and summary judgment must be entered in its favor. (D.I. 31 at
14-15) Neither party cites caselaw on this issue.

42 U.S.C.A. § 2000e-3 provides:

(a) Discrimination for making charges, testifying, assisting, or participating in
enforcement proceedings.

It shall be an unlawful employment practice for an employer to discriminate
against any of his employees . . . because [s]he has opposed any practice made
an unlawful employment practice by this subchapter, or because [s]he has made
a charge, testified, assisted, or participated in any manner in an investigation,
proceeding, or hearing under this subchapter.

In determining what type of activity qualifies under §2000e-3, the Third Circuit has

18

applied a substance-over-form approach. The determinative question seems to be

whether the grievance sufficiently articulates an opposition to discrimination or

discriminatory retaliation.[9]  *See Robinson v. Southeastern Pennsylvania Transp.*

*Authority*, 982 F.2d 892, 896 (3d Cir. 1993) (employee's letter to congressman

expressing concern over supervisor's "harrassing nothing but black employees"

constituted protected Title VII activity); *compare Walden v. Georgia-Pacific Corp.*, 126

F.3d 506, 513 n.4 (3d Cir. 1997) (stating that a letter that "did not complain of acts that

are unlawful under Title VII," but was only "a general grievance about changes in

working conditions," did not qualify) (citation omitted); *Barber v. CSX Distribution*

*Services*, 68 F.3d 694, 701 (3d Cir. 1995) (letter to department of human resources did

not constitute protected conduct for a prima facie case of retaliation where it

"complain[ed] about unfair treatment in general and expresse[d] his dissatisfaction with

the fact that someone else was awarded the position," but did "not specifically complain

about age discrimination"). In *Barber*, the Third Circuit stated that

> it is important to note that we do not require a formal letter of complaint to an
> employer or the EEOC as the only acceptable indicia of the requisite "protected
> conduct" under the ADEA. *See, e.g., Sumner v. United States Postal Serv.*, 899
> F.2d 203, 209 (2d Cir. 1990) (explaining that acceptable forms of protected
> activity under Title VII's opposition clause include formal charges of
> discrimination "as well as informal protests of discriminatory employment
> practices, including making complaints to management, writing critical letters to
> customers, protesting against discrimination by industry or society in general,
> and expressing support of co-workers who have filed formal charges"). It is
> neither necessary, nor appropriate to here attempt to define with precision the

---

[9]Although the Third Circuit has not decided what type of hostile opposition
messages are removed from Title VII protection, a formal Merit Rule complaint neither
interferes with the performance of one's job nor is it so obnoxious that it does not
qualify for such protection. *See Campbell v. Abercrombie & Fitch, Co.*, Civ. No. 03-
3159, 2005 WL 1387645, *6 (D.N.J. June 9, 2005) (collecting circuit authority).

19

type of conduct that will give rise to a retaliation claim under the ADEA. Our analysis requires only that we analyze the message that Barber conveyed, and not the medium of conveyance.

68 F.3d at 702. The court declines to adopt the opposite approach as advocated by

defendant at bar. Plaintiff's Merit Rule grievance complained about Carroll's conduct,

Fred's conduct and, generally, DOS's taking action by transferring or otherwise altering

plaintiff's responsibilities. (D.I. 32 at A50) This qualifies as "protected activity" for

purposes of Title VII, and defendant's motion is denied on this ground.

## V. CONCLUSION

For the aforementioned reasons, summary judgment is granted for defendant on

plaintiff's hostile work environment claim, and denied as to plaintiff's retaliation claim.

An appropriate order shall issue.

20